Vincent C. GIBLIN, Petitioner,

v.

COMMISSIONER OF INTERNAL
REVENUE, Respondent.
No. 15587.

United States Court of Appeals
Fifth Circuit.
Nov. 23, 1955.

Hilton R Carr, Jr., Herbert A. Warren, Jr., Vincent C. Giblin, Miami, Fla., for petitioner.

John Potts Barnes, Chief Counsel, Internal Revenue Service, Chicago, Ill., Rollin H. Transue, Sp. Atty., Internal Revenue Service, Washington, D. C., H. Brian Holland, Asst. Atty. Gen., Ellis N. Slack, Karl Schmeidler, Attys., Department of Justice, Washington, D. C., for respondent.

Before RIVES, TUTTLE and JONES, Circuit Judges.

TUTTLE, Circuit Judge.

This is a petition for review of a decision of the Tax Court involving income taxes for 1945. The questions presented for our consideration are two. First, whether loans made by taxpayer to a corporation, of which he was an officer, director, large stockholder and principal actor, are deductible in full as a business bad debt under Section 23(k) (1) of the Internal Revenue Code of 1939, 26 U.S. C.A., or whether these loans are deductible only under Section 23(k) (4) as a

non-business bad debt not incurred in taxpayer's trade or business, and are thus to be taken into account as a short term capital loss. Second, whether taxpayer's cancellation in 1945 of $31,668.-23 of a total indebtedness owing him of $51,668.23 from the corporation at a time when it was insolvent both before and after the cancellation, such cancellation being made coincident with a refinancing and reorganization of the corporation's affairs to provide it with capable management and enable it to obtain additional funds, constitutes a bad debt loss or amounts to a contribution to the corporation's capital.[1]

The relevant facts are not in dispute. During 1945 taxpayer was a resident of Miami, Florida, and was engaged that year in the practice of law, from which he received a substantial income during the tax year in question. Beginning in 1925 he commenced a course of activities not directly related to the practice of law.

In the early part of 1925 he engaged in the formation of a land owners association in Okeechobee County, Florida. The purpose of this association was to attempt to take control of the Everglades Drainage District from the trustees of the Internal Improvement Fund of the State of Florida and place control in the land owners themselves. He devoted three months to this venture before moving to Fort Lauderdale, Florida to resume the practice of law.

He then entered into a business venture in connection with a real estate subdivision in Broward County known as Chateau Park. This venture consisted of efforts by the petitioner on behalf of property owners in the subdivision to obtain releases from mortgages on a portion of their property. The petitioner was successful in persuading the mortgage holders to release a portion of the property and for his efforts received some forty lots in the subdivision.

The petitioner then attempted to go into the real estate business with a friend named Kelly and purchased some acreage north of Fort Lauderdale for this purpose. This venture collapsed as a result of the failure of the real estate market to revive after the Florida land boom crash.

From 1927 to 1929 the petitioner served as a circuit judge of Broward County, Florida. The petitioner then moved to Miami and formed a law partnership.

His next business venture came a few weeks after the formation of the law partnership in Miami. The petitioner leased a race track in Pompano, Florida for the purpose of operating horse racing under a system which he had devised and which he believed would be considered legal by the Courts even though wagering on horse racing was, at that time, illegal in the state. He put $3,000 or $4,-000 into the venture, operated and man-

1. The relevant statute is Section 23, Internal Revenue Code of 1939, 26 U.S.C.A. § 23:

"§ 23. Deductions from gross income. "In computing net income there shall be allowed as deductions:

&ast; &ast; &ast; &ast; &ast;

"(k) [as amended by Sec. 124(a) of the Revenue Act of 1942, c. 619, 56 Stat. 798, and Sec. 113 of the Revenue Act of 1943, c. 63, 58 Stat. 21] Bad debts.

"(1) General rule. Debts which become worthless within the taxable year; or (in the discretion of the Commissioner) a reasonable addition to a reserve for bad debts; and when satisfied that a debt is recoverable only in part, the Commissioner may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction. &ast; &ast; &ast; This paragraph shall not apply in the case of a taxpayer, other than a corporation, with respect to a non-business debt, as defined in paragraph (4) of this subsection.

&ast; &ast; &ast; &ast; &ast;

"(4) Non-business debts. In the case of a taxpayer, other than a corporation, if a non-business debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months. The term 'non-business debt' means a debt other than a debt evidenced by a security as defined in paragraph (3) and other than a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business. &ast; &ast; &ast;"

694

aged the track himself with great difficulty in an effort to keep the track operating until a court test of the legality could be had. The system devised by the petitioner was intended to be used in the large horse racing tracks and dog tracks after its legality was tested at Pompano. However, the other tracks adopted another system of operation and the petitioner's venture failed. The petitioner devoted the major portion of his time for a period of four or five months to this venture.

In 1932 the petitioner and Jack August formed a corporation known as the Biscayne Bonding Co. This corporation wrote surety bonds as agents for a principal and was capitalized by $2,500 of the petitioner's money and $2,500 from Jack August. This venture failed when the principal became bankrupt. The petitioner devoted a substantial part of his time to this venture. It was estimated by Jack August that the petitioner devoted approximately 50% of his time to the business.

His next business venture was in 1934 in connection with the Pensauken Kennel Club. This venture consisted of operating a dog track in New Jersey just outside of Philadelphia. The New Jersey legislature was about to pass a bill authorizing greyhound racing in arenas "now" owned by municipalities. Through the efforts of the petitioner an agreement was reached with the town of Pensauken, land was acquired, and an arena was erected overnight. The law was passed and a permit for dog racing was obtained. The petitioner invested all of his own money that he could raise in the venture. After being in operation for only 49 days the venture collapsed as a result of a court ruling. But in that 49 day period the venture was so successful that all loans were repaid with 6% interest, a 20% stock dividend was paid and the share of the profits received by the petitioner was $25,000. If the track had operated another 30 days the petitioner would have made $150,000 and would have been able to get out of the practice of law. He devoted 8 months of his time

to this venture and was gone from Miami during this entire period of time.

In 1935 and 1936 the petitioner and an associate devoted their efforts to procuring a lease from the City of Miami for the operation of a restaurant in Biscayne Bay Front Park in Miami. They were successful in their efforts and each received a ⅓ interest in the corporate venture. The petitioner sold his stock to his associate.

In 1939 the petitioner organized the Economy-Profit Sharing Association, a cooperative corporation, the purpose of which was to provide laundry and dry cleaning services to the members of the cooperative at a price much less than the price then fixed by the State Laundry and Dry Cleaning Board. The petitioner acted as president and general manager and devoted no less than 70% of his time for approximately two years to this venture. The gross receipts of the corporation were $400,000 or $500,000 a year. The venture operated approximately two years until the legislature finally repealed the act which had established the State Laundry and Dry Cleaning Board.

The petitioner engaged to a slight extent in the grain market until he found out he knew little or nothing about that activity. He did make a $10,000 profit in one year.

He invested some money in the B–G Realty Co. in 1936, but does not recall the purpose of the corporation.

He invested in Saunders and Storm, Inc., but does not recall the purpose of that corporation.

On January 22, 1945 a corporation was formed by the petitioner and Jerry Donovan under the name of Stag Bar, Inc. with an authorized capital of $500 consisting of ten shares of stock with a value of $50 per share. Donovan had no funds and it was agreed that petitioner would put up the initial capital of $500. Five shares of capital stock were issued to petitioner and five shares to Donovan. It was further agreed that the petitioner would advance the corporation up to $10,000 with the understanding that all advances by the petitioner should be re-

paid before any dividends were declared and paid. The petitioner later became dissatisfied with Donovan's operation of the business and his stock was transferred to the petitioner. On May 8, 1945 the petitioner arranged with Dinty Dennis to take over the management of the corporation and transferred to Dennis 3⅓ of his shares of the initial stock. By that date the petitioner had advanced $17,000 to the corporation and a resolution was adopted authorizing the issuance to petitioner of 65 promissory notes aggregating $17,000. Only one note for $200 was paid. After Dennis took over management the operations of the bar were enlarged to include a restaurant and lounge necessitating additional expenditures. Between May 8, 1945 and December 12, 1945 the petitioner made further advances to the corporation in an amount in excess of $34,000. The petitioner became dissatisfied with the operation of the business under Dennis and on December 8, 1945 Dennis resigned and petitioner acquired from Dennis the 3⅓ shares issued to him on May 8, 1945.

On December 12, 1945 the petitioner and his brother, Creston A. Giblin, entered into a written agreement. After reciting that the corporation was indebted to the petitioner on account of advances and loans in the sum of $51,668.23 as of December 8, 1945, and to better the corporation's financial status and provide it with capable management, it was agreed, in substance, that the petitioner would assign to Creston A. Giblin five shares or 50% of the capital stock of the corporation and accept from the corporation a partial payment of the sum of $20,000 in cancellation of its indebtedness to him. Creston A. Giblin agreed that in consideration of the foregoing he would accept and assume the presidency, general managership, and directorship in the corporation, and that he would lend the company not less than $15,000 which was not to become due or repayable in whole or in part until December 31, 1946, but which was to be repaid with interest at 5% per annum.

At a special meeting of the directors of the corporation held on December 12, 1945, a resolution was adopted approving the aforementioned agreement. Creston A. Giblin was elected president, general manager, and a director, and accepted these offices.

At this meeting the petitioner stated that in view of the corporation's financial condition he would accept its note in the sum of $20,000 payable on December 31, 1946, bearing interest, payable on maturity, at the rate of 5% per annum. A resolution was duly adopted accepting the petitioner's offer and authorizing the president to execute the corporation's note for $20,000. On December 12, 1945, the corporation executed and delivered to the petitioner a note in compliance with the terms of the offer. The corporation thereafter functioned until 1950, when it was dissolved. Both before and after the cancellation of the indebtedness by petitioner the corporation was insolvent.

Petitioner makes much of the fact that from 1926 to 1945 he had endeavored to provide himself with escape from the practice of law. We think this unimportant in order to bolster petitioner's contention that not less than 50% of his time had been devoted during that period of time to the promotion, organization, financing, and operating of corporations and other business enterprises. The evidence showed that as opportunities presented themselves to petitioner he used the proceeds from his law practice to engage in some kind of enterprise which he hoped would produce financial independence for him. Petitioner's right to deduct the amount of the cancelled debt depends not upon his showing, as the Tax Court seemed to think, that he was in the business of lending money, but rather that he was regularly engaged in the business of "dealing in enterprises," during the course of which he operated either as a proprietor, as a stockholder, as a partner or as a lender or in a combination of these capacities, contributing to each enterprise his own

initiative and energy, and such financial backing as it required.

The Tax Court sustained the Commissioner's deficiency "because of our finding of fact that the petitioner, in the taxable year in question, was not engaged in the business of making loans to corporations." The opinion also contains the following language, which is significant in our determination as to the correctness of the Tax Court's decision:

"While the record shows that for some years prior to the taxable year in question the petitioner also promoted, organized, and invested in various corporations and other business enterprises, the evidence does not show he was so engaged in the taxable year. No instance is revealed of petitioner having made loans to any corporation other than to Stag Bar, Inc."

The language of the opinion of the Tax Court indicates to us that it did not really come to grips with the issue which taxpayer sought to present. Taxpayer did not seek to show that he was engaged in the business of making loans. Neither did he seek to have the Tax Court "pierce the corporate veil" and find that he was engaged in the restaurant business or in any of the other businesses which he had promoted and dealt with during the preceding twenty years. What he did seek to prove was that he was regularly engaged in the business of seeking out business opportunities, promoting, organizing and financing them, contributing to them substantially 50% of his time and energy and then disposing of them either at a profit or loss; that if, in carrying out this alleged business, he sustained a loss resulting from a bad debt owed him by one of the corporations which he had promoted, then he would be entitled to take a business bad debt deduction, because such loss was not a "non-business debt" as described in Section 23(k) (4).

Both the Tax Court and Court of Appeals have recognized the type of activity engaged in by petitioner as satisfying the requirement of "carrying on any trade or business," when such activity has been sufficiently extensive to warrant the conclusion that the individual involved is more than a passive investor. Foss v. Commissioner of Internal Revenue, 1 Cir., 75 F.2d 326; Maloney v. Spencer, 9 Cir., 172 F.2d 638; Commissioner of Internal Revenue v. Stokes' Estate, 3 Cir., 200 F.2d 637; Henry E. Sage v. Commissioner of Internal Revenue, 15 T. C. 299; Scott v. Commissioner of Internal Revenue, —— T.C. ——, C.C.H. Tax Service 21, 231(m).

In the Foss case the disputed item was the deductibility of attorneys' fees. For such fees to be deductible they must have been "paid or incurred during the taxable year in carrying on any trade or business." Foss was a capitalist who owned large interests in a number of corporations and in unincorporated properties and activities. He served as a director on many corporation boards. He devoted his time to looking after investments and to the operations of the various corporations in which he was an officer. The fee in question was paid by him in connection with litigation brought against him on the theory that he was manipulating in his individual interest the affairs of a corporation in which he owned stock control and against the corporate interest. The court held that this was clearly an ordinary and necessary expense of the business of owning large interests in and operating in relation to the group of corporations involved. It reversed the Tax Court in so holding.

The Ninth Circuit Court of Appeals, in the Maloney case, sustained the judgment of the District Court, 73 F.Supp. 657, which found that losses on loans made to three wholly owned corporations, which taxpayer organized and to which he leased physical plants for their operation, were sustained in the course of his "'business of acquiring, owning, expanding, equipping and leasing food processing plants.'" [172 F.2d 640.]

In the Stokes' Estate case [200 F.2d 638] the Court of Appeals for the Third Circuit affirmed a holding of the Tax Court that "'the decedent was engaged

individually in the business of exploiting patents either by organizing, financing, and actively participating in the management of companies organized to acquire or operate under them or by transferring such patent rights to existing companies in which he was a stockholder and active in the management thereof.' "

The Tax Court recognized the same fundamental concept of engaging in the business of dealing in enterprises in the Sage case. There the Tax Court found that:

"The petitioner has outlined many separate activities in which he participated from the time he was graduated from college until about 1946. There is testimony that he considered additional proposals which were brought to him during that time and that he was known as a person to whom such proposals might be brought profitably. Some of his activities may appear trivial and it may be inappropriate to fit some of the uses to which he put his time or money or both into the pattern of any business regularly carried on by him. But even if some are disregarded, enough are left to show that he was regularly carrying on a business. There may be difficulty or difference of opinion in defining that business properly, but it existed and was apparent."

So, also did the Tax Court follow petitioner's theory in the Scott case. There the court said:

"The advances made by Charles [Scott] to Keystone Athletic Products, Inc. were not non-business bad debts but were proximately related to a business regularly carried on by him. They were a part of a business of organizing, promoting, investing in, lending money to and managing numerous commercial enterprises or of doing one or more of those things in each case, before, during and after the years 1948, 1949 and 1950."

See also Vincent C. Campbell v. Commissioner of Internal Revenue, 11 T.C. 510.

We recognize the fact that the question whether the activities of a taxpayer constitute carrying on a trade or business is largely one of fact, the solution of which "requires an examination of the facts in each case." Higgins v. Commissioner of Internal Revenue, 312 U.S. 212, 217, 61 S.Ct. 475, 478, 85 L.Ed. 783. The findings of the Tax Court or the District Court, therefore, are normally critical on this issue. Here, however, the Tax Court's finding on the point in issue was inconclusive. Under its findings of fact it said:

"The petitioner was not regularly engaged in the taxable year 1945 in making loans to corporations. No loans are shown to have been made to any corporation in 1945 other than the alleged loans to Stag Bar, Inc."

Under the heading "Opinion" the court said it had decided the loss "is not deductible as a business bad debt under Section 23(k) (1) * * * because of our finding of fact that the petitioner, in the taxable year in question, was not engaged in the business of making loans to corporations." The court then said: "While the record shows that for some years prior to the taxable year in question, the petitioner also promoted, organized and invested in various corporations and other business enterprises, the evidence does not show he was so engaged in the taxable year." Now, this statement is patently contrary to the admitted facts unless it is taken in context with what follows:

"No instance is revealed of petitioner having made loans to any corporation other than to Stag Bar, Inc."

The fact that petitioner *promoted, organized* and *invested* in the Stag Bar enterprise in the taxable year is without dispute, and yet the court said:

"The evidence does not show he was so [that is, promoting, organizing and investing] engaged in the taxable year."

This statement is so contrary to fact as to be meaningless unless we consider it with the comment about making loans. From a consideration of that comment we conclude that the Tax Court meant to state that there was no evidence that the taxpayer was engaged in the business of making loans during the taxable year. As we have already pointed out, such a finding is not determinative of the case.

■ Clearly, on the undisputed facts, Giblin was such a person as was described in the cases we have cited above. On eleven or twelve occasions between 1926 and 1945 he had contributed his time, talent, energy and money to the exploitation of an idea to make money apart from his practice of law. He obviously lent such aid to these various enterprises as he considered, in the exercise of his business judgment, would best accomplish that purpose. To hold that a loss suffered from the becoming worthless of a loan made to one of these enterprises was not suffered in the course of his engaging in a trade or business, would be to apply a sterile and rigid approach that is not contemplated by the statute.

■ We now turn to the contention of the government that the transaction entered into in December, 1945, by which Giblin cancelled some $31,000 of the indebtedness due him from the corporation, amounted to a contribution to the capital of the corporation and did not constitute a bad debt loss. The government suggests, but does not urge, its belief that the loans, even when made, were not loans but were contributions to capital. Such a position, if asserted here, would be unavailing under the principle announced by us in Rowan v. United States, 5 Cir., 219 F.2d 51. But, the government says, regardless of the character of the transaction initially, the relinquishment of $31,000 of the $51,000 debt in December amounted to a voluntary relinquishment which, as the government contends, must be deemed a contribution to capital, regardless of other factors or circumstances then existing.

We take it as conceded by the government that the cancellation of a debt which in fact is uncollectible, absent the relationship of stockholder and corporation, would amount to a bad debt loss (whether or not it would be deductible under Section 23(k) (1)). But, we are told a gratuitous release by a taxpayer of an obligation owing to him from the corporation, of which he is a stockholder, necessarily precludes him from claiming a deduction based on the existence of this obligation. The government's brief asserts that it has been well settled for a long time both by governing Treasury Regulations and by a long line of judicial decisions, that where a large stockholder of a corporation, such as this stockholder, gratuitously forgives a debt due from the corporation, this constitutes a contribution to the corporation's capital.[2]

■ Except for Bratton v. Commissioner, these authorities do not support this broad proposition. The Treasury Regulation referred to is not a regulation relating to the section of the Internal Revenue Code dealing with deductions, much less bad debt deductions. It is a regulation expounding the administrative policy with respect to the ascertainment of income. It is intended as a guide to the Commissioner of Internal

2. Treasury Regulations 111, promulgated under the Internal Revenue Code of 1939:
"Sec. 29.22(a)–13. Cancellation of indebtedness.—(a) In general.—* * * In general, if a shareholder in a corporation which is indebted to him gratuitously forgives the debt, the transaction amounts to a contribution to the capital of the corporation to the extent of the principal of the debt." The brief then cites the following appellate court cases:

Bratton v. Commissioner, 6 Cir., 217 F. 2d 486; Crean Bros. v. Commissioner, 3 Cir., 195 F.2d 257; Chenango Textile Corp. v. Commissioner, 2 Cir., 148 F.2d 296; Carroll-McCreary Co. v. Commissioner, 2 Cir., 124 F.2d 303; First Nat. Bank & Trust Co. v. United States, 5 Cir., 115 F.2d 194; Commissioner v. Auto Strop Safety Razor Co., 2 Cir., 74 F.2d 226; United States v. Oregon-Washington R. & Nav. Co., 2 Cir., 251 F. 211.

Revenue in determining whether, when a stockholder gratuitously forgives a debt owed him by the corporation, this is to be considered as income to the corporation. Moreover, it is to be noted that the regulation itself qualifies the application of the rule by use of the words "in general." Even in the proper application of the regulation in determining income it does not apply where, after the forgiveness, the corporation is still insolvent. An effort to apply this regulation as a guide to the construction of the bad debt provisions of the statute is clearly misdirected.

The Bratton case is a decision of the Sixth Circuit that supports the government's contention here. With due respect to the court, however, it is necessary to point out that it based its decision primarily on the case of Carroll-McCreary Co., Inc., v. Commissioner, 2 Cir., 124 F.2d 303, and the Treasury Regulation above referred to. Carroll-McCreary was not dealing with a bad debt loss but dealt with the question of what was income to the corporation. We think, therefore, that it was not authority for a decision on the meaning of the bad debt section of the statute. In arriving at its conclusion in Bratton, the court departed from the basis of the decision in the Tax Court and apparently followed the theory asserted by government counsel here. It is significant to note that here too the Tax Court declined to base its decision on the theory advanced by the government. We are confident that in failing to accept the theory of reliance upon the inapplicable regulation, we are arriving at the correct solution of the problem.[3]

The other cases cited by the government relate to the question as to what is income, and there the court properly considered the Treasury Regulations which are applicable to that situation.

 The discussion of this second point in the government's brief is not an-

swered in petitioner's brief, since the point was not material in the Tax Court's decision. We have, therefore, not been benefitted by a discussion of this issue by the taxpayer. However, having found that on the facts involved the economic loss suffered by petitioner was one incurred while he was engaged in a trade or business, it becomes necessary for us to consider the argument put forth by the government that even though that is so, nevertheless such loss does not amount to a statutory bad debt loss. We find that the authorities cited for this proposition do not support this contention. It being clear from the record below that the corporation was insolvent both before and after the release of the indebtedness, it follows necessarily that such cancellation resulted in a loss to the taxpayer, which is deductible under the provisions of Section 23(k) (1).

The decision of the Tax Court is Reversed.

---

3. Furthermore, it is probably appropriate to note that on the fact situation presented in Bratton, we have held differently in deciding Edwards v. Allen, 5 Cir., 216 F.2d 794.