Saul Wilson v. Commissioner.
Wilson v. Commissioner
Docket No. 81276.
United States Tax Court
T.C. Memo 1961-120; 1961 Tax Ct. Memo LEXIS 229; 20 T.C.M. (CCH) 583; T.C.M. (RIA) 61120; April 28, 1961
*229 David L. Weltman, Esq., for the petitioner. Lawrence A. Wright, Esq., for the respondent. SCOTT Memorandum Findings of Fact and Opinion SCOTT, Judge: Respondent determined a deficiency in the amount of $2,078.90 in petitioner's income tax for 1952. The deficiency resulted from the disallowance by respondent of a deduction in the amount of $12,000 claimed by petitioner with the following explanation: "Loan to Wayside Food Shop, Inc. Corp. dissolved & debt uncollectable in 1952." Respondent, in the notice of deficiency, explained his disallowance of the deduction as follows: It has been determined that you are not entitled to the deduction in the amount of $12,000.00, claimed on your 1952 income tax return as a business bad debt, because you have not established that there was a business bad debt, as distinguished from a non-business bad debt, a contribution to capital, or a capital expenditure. The issues for decision are whether there existed an indebtedness from Wayside Food Shop, Inc., to petitioner in the year 1952 in the amount of $12,000, and, if so, did this indebtedness represent a business bad debt as distinguished from a nonbusiness bad debt. Findings *230 of Fact Some of the facts have been stipulated and are found accordingly. Petitioner, Saul Wilson, during the taxable year 1952, lived at Darlington Apartments, Room 1118, Santurce, Puerto Rico, and presently lives at Crestview Circle, Long-meadow, Massachusetts. Petitioner filed his individual income tax return for the taxable year 1952 with the district director of internal revenue at Baltimore, Maryland. On this return petitioner reported as salaries and wages the amount of $6,000 received from National Transparent Plastics - Indian Orchard, Massachusetts; and $2,600 from Rico Products Co., Inc., Carolina, Puerto Rico. He reported other income in the amount of $572.87 which was composed of business profits from the business activity of Certified Public Accountant in the amount of $3,286.56, partnership profits from Wilson Products Co., Main Street, Springfield, Massachusetts in the amount of $1,162.89; dividend from Budd Company in the amount of $12.50; and net profits from rents in the amount of $122.33; reduced by a partnership loss from National Transparent Plastics Boot Co., Indian Orchard, Massachusetts in the amount of $3,011.41 and a capital loss carryover from 1948 of *231 $1,000. From the total income so reported in the amount of $9,172.87, petitioner deducted the amount of $12,000 described as a miscellaneous deduction, "Loan to Wayside Food Shop, Inc. Corp. dissolved & debt uncollectible in 1952", thus showing no net income and no income tax due. At all times material hereto petitioner kept his accounts and filed his Federal income tax returns on the cash basis and his taxable year was the calendar year. After graduating from high school in 1926 petitioner became employed by a bank. While working at the bank he attended college in the evenings and after 4 years received a college degree. He attended college for another year and received another degree. Both of his college degrees are in business. When he first began working for the bank he was a messenger boy. He held other positions in the bank such as handling the general ledger and in 1938 when he left his employment with the bank most of his work was in connection with utilities. In 1931, after finishing evening college, petitioner took the examination for Certified Public Accountant. He passed the examination but was not granted his certificate at that time because of the requirement of 2 years *232 of practical experience before the issuance of a certificate. However, while he was employed by the bank, he did some public accounting work for one or two clients outside of his normal working hours at the bank. In 1938 petitioner answered an advertisement from Sidney Kohn, a public accountant in Springfield, Massachusetts, for a person to do accounting work for him on an hourly basis. Kohn employed petitioner and petitioner began working for him on an hourly basis and his work for Kohn consumed approximately one-half of his time. Petitioner continued to do public accounting work for the two or three clients for whom he had done such work while employed by the bank. On December 27, 1940, petitioner received a certificate from the Commonwealth of Massachusetts qualifying him as a Certified Public Accountant. In 1938 petitioner bought a lease for a clubhouse from the College Highway Country Club in Southwick. The clubhouse had a liquor license. It served meals, served some parties, and had a little night business. The operation of this club took most of petitioner's time other than that devoted to working for Kohn. Petitioner continued to work for Kohn until around the end of *233 1940 or early 1941, at which time he accepted an auditing position with the United States Government in the War Department. After taking this Government position, petitioner found that he was not able also to handle the clubhouse work and so he disposed of the clubhouse lease around 1941. After taking the position with the Government, petitioner did not continue to be an employee of Kohn, but he did rent from Kohn a part of an office in the suite of offices leased by Kohn and his name remained on the office door. He kept his position with the War Department until sometime in 1942. When petitioner left that position he resumed his public accounting work in the office which he sublet from Kohn but found that he did not have sufficient work to occupy all of his hime. He took a position with the Stevens Arms Company, Division of Salvage Arms, which he kept for approximately 2 years until sometime in 1944. During the time petitioner was employed by Stevens Arms Company, he maintained his office in the suite with Kohn and continued to do public accounting work for the two or three clients for whom he had previously done such work, and obtained a few more clients for such work as preparing *234 tax returns. The public accounting work done by petitioner while he was employed by Stevens Arms Company consumed a very small portion of his time. When petitioner left Stevens Arms Company in 1944 he resumed his public accounting work in the office with Kohn but found that he did not have sufficient work to occupy all of his time, and he did not consider the income he was obtaining from public accounting work as adequate. Petitioner had done some work for the Hampden Brewing Company in Springfield, Massachusetts and from the knowledge so acquired and some information he had acquired with respect to liquor licenses, thought he might become interested in the liquor business. Petitioner let a few lawyer friends of his know that if there was an opportunity to purchase an establishment with a liquor license he might be interested in being so notified. Some time in 1944 a lawyer approached petitioner with the information that the proprietor of the Auburn Cafe had died and his wife was not able to run the cafe. Petitioner looked into the condition of the Auburn Cafe which was a corporation and as a result of this investigation he purchased the stock of this corporation in September 1944. *235 Petitioner considered it advantageous to purchase the stock of a corporation which had a license to sell liquor in the corporate name since no transfer of the license was required when the corporate entity continued to be the licensee. Where a license for the privilege of selling liquor to the public was transferred from one person to another, approval of the transfer by the local license commission and the State commission was required. Some time in November of 1944 petitioner sold the stock of Auburn Cafe which he had purchased in September. In 1945 petitioner purchased the stock of Murray's of Springfield, Inc., and sold the stock in 1947 or 1948. In 1945 petitioner also purchased the stock of the Roxy Cafe and The Chalet. He sold the Roxy Cafe stock in 1947 and The Chalet stock in 1949 or 1950 after having leased The Chalet for approximately a year. He purchased the stock of Tycho's Restaurant in 1946 and sold it approximately 6 months later. He purchased the stock of Gill's Cafe in 1946 and sold it about a year later. He purchased the stock of Hamel's Cafe in 1945 and sold it in 1947. He repurchased the stock of the Roxy Cafe with an associate in 1948 and sold it again in the *236 same year. In 1947 he purchased the stock of the Century Restaurant and sold it in 1948, and for a short time he held an interest in the Quaboug Hotel, Inc. Each of these corporations held a license to sell liquor. In 1947 petitioner and Albert Miller each purchased one-half of the stock of the Wayside Food Shop, Inc., a corporation which had a license to sell liquor. At the time of this purchase, petitioner still owned the stock of Murray's of Springfield, Inc., Roxy Cafe, The Chalet, Gill's Cafe, Hamel's Cafe, and Century Restaurant. Prior to the purchase by petitioner and Miller of Wayside Food Shop, Inc.'s stock, it had been owned by three persons who were not active night club operators. The corporation had outstanding bills of approximately $30,000. The persons from whom petitioner and Miller purchased the stock agreed to pay $10,000 to the corporation to be used to discharge bills of the corporation with the understanding that Miller and petitioner would together transfer $20,000 to the corporation to be used in paying its bills. The stated purchase price of the stock of Wayside Food Shop, Inc., was $1. On August 5, 1947, petitioner drew a check to Wayside Food Shop, Inc. *237 for $19,293.73. Miller had given petitioner $10,000 of the $19,293.73 represented by the check of August 5, 1947. On November 24, 1947, petitioner drew a check in the amount of $957 to Wayside Food Shop, Inc., which was endorsed by that corporation and deposited to its account. The amounts of $19,293.73 and $957 represented by checks drawn by petitioner to Wayside Food Shop, Inc., and the $10,000 transferred to Wayside Food Shop, Inc., by the previous owners of its stock, were used to pay the outstanding bills of Wayside Food Shop, Inc., at the date of the transfer of its stock to petitioner and Miller. Petitioner occasionally had advanced funds to corporations other than Wayside Food Shop, Inc., the stock of which he had purchased, and in each instance such advance had been repaid to petitioner prior to the sale of the stock of the corporation to which the advance was made. After petitioner acquired the stock of the various corporations, in many instances he would devote time to actually working in the operation of the business in an effort to make such operation more efficient. After petitioner and Miller acquired the stock of Wayside Food Shop, Inc., both of them from time to *238 time made advances of funds to the corporation, and both of them received some repayment of such funds advanced to the corporation. Miller and petitioner were both officers and directors of Wayside Food Shop, Inc., from the date they purchased the stock thereof until sometime in 1949. In 1949 Miller resigned as manager of the Wayside Food Shop, Inc., and moved away from the vicinity. After 1949 the officers of Wayside Food Shop, Inc., were petitioner and Irene S. Sullivan, his secretary. As of December 31, 1949, in addition to petitioner and Irene S. Sullivan, Morris Usdansky was a director of the corporation and its clerk. For the year 1950 Margaret B. Lowe, Irene S. Sullivan and petitioner were the directors. Neither Irene S. Sullivan, Morris Usdansky, nor Margaret B. Lowe ever made any advances to Wayside Food Shop, Inc. The books of Wayside Food Shop, Inc., were kept in petitioner's office and the bookkeeping was done by a girl employed in his office. In each of the years 1947 through 1952, the books of Wayside Food Shop, Inc., carried a "Due to Officers" account in which was recorded moneys advanced, unpaid fees, and payments to officers. The closing entry in this account for *239 each of the years 1947 through 1952 and the total thereof were as follows: Money
Unpaid
Year
Advanced
Fees
Total
1947
$20,000.00
$20,000.00
1948
6,545.00
6,545.00
1949
2,974.42
$ 3,500.00
6,474.42
1950
14,259.87
5,000.00
19,259.87
1951
(2,896.80)
5,000.00
2,103.20
1952
2,681.95
2,681.95
Total
$43,564.44
$13,500.00
$57,064.44
Petitioner never reported the amounts credited on the corporate books as unpaid fees as income on his Federal income tax returns. Petitioner, at an undisclosed date sometime after 1944, unsuccessfully negotiated for the acquisition of the stock of the Main Cafe, Rockville Restaurant, Triangle Cafe, Log Cabin, Rockingham Cafe, and Blue Grotto, all of which were corporations which had licenses to sell liquor. At some undisclosed time after 1944 petitioner acted in the capacity of broker on behalf of the seller of the Emery Cafe & Grille and acted in this capacity on behalf of the buyer of Rovelli's Restaurant. In 1944 and continuously until sometime in 1951 petitioner leased office space in Kohn's office and did public accounting work. During all this time petitioner's name was on the door and he was *240 listed in the telephone book as a Certified Public Accountant. In 1951 petitioner gave up his leased space in Kohn's office and began to share an office with another Certified Public Accountant named Morris Dame, which office he continued to occupy with his name shown on the door as a Certified Public Accountant throughout the years here involved. Petitioner had an understanding with Morris Dame that Dame would look after his accounting clients while he was away. After petitioner and Miller acquired the stock of Wayside Food Shop, Inc., petitioner attempted to improve its operation and put it on a profitable basis. After he felt this had been accomplished sometime during the year 1948, petitioner attempted to sell the stock of Wayside Food Shop, Inc., and continued his efforts to sell the stock of this corporation until sometime in 1952. In 1952 the holders of the mortgage on the property of Wayside Food Shop, Inc., commenced foreclosure proceedings. Petitioner locked the door of the establishment and left for San Juan, Puerto Rico, where he had accepted a position as manager of a factory of which he was part owner. Petitioner never maintained a listing in a telephone directory under *241 any business other than that of Certified Public Accountant. Petitioner has been interested in the plastics business since 1951. Petitioner's advances to the Wayside Food Shop, Inc., were not interest-bearing nor formalized by notes. Petitioner kept no personal record of these advances as distinguished from the corporate record which was kept by a bookkeeper employed in petitioner's office. Petitioner, on his Federal income tax returns, reported the gains or losses on the sales of the stocks of the various establishments owning liquor licenses which he purchased and resold as heretofore set out in all instances as capital gains or losses. The Wayside Food Shop, Inc., was indebted to petitioner in 1952 for amounts advanced by him to that corporation in an amount in excess of $12,000 and this indebtedness became totally worthless in 1952. Opinion The first issue between the parties is whether Wayside Food Shop, Inc., was indebted to petitioner in 1952 in an amount equal to or in excess of $12,000. Respondent contends that petitioner has failed to show that the corporation was indebted to him in any amount. He contends that the original $10,000 paid by petitioner to the corporation *242 was a capital investment by petitioner in the stock of the corporation and that petitioner has failed to substantiate sufficient additional advances that had not been repaid to him to equal $12,000 or any other ascertainable amount. Petitioner was in Puerto Rico when he filed his 1952 income tax return and did not have available his personal records. At that time he did not know the exact total of the amounts he had advanced to Wayside Food Shop, Inc., but felt sure that the amount of these advances that had not been repaid was in excess of $12,000, the amount of the deduction claimed on the tax return. Although petitioner offered evidence at the trial in an attempt to establish an amount in excess of $12,000 exclusive of the original advance of approximately $10,000 made when he purchased the stock, he has made no claim in his petition or during the course of the trial or on brief for a deduction in excess of $12,000. Petitioner in a letter to respondent referred to the original $10,000 advance to the corporation as a capital investment but now contends that this advance was a loan to the corporation. It is unnecessary to decide this question since we agree with the petitioner that *243 the evidence establishes that the unrepaid advances by him to Wayside Food Shop, Inc., exclusive of the original $10,000, were in excess of $12,000. The parties agree that any indebtedness of Wayside Food Shop, Inc., to petitioner in 1952 became worthless in that year. The main issue for decision is whether the $12,000 is a debt incurred in the petitioner's trade or business, deductible under section 23(k)(1), or is a nonbusiness bad debt which must be treated as a loss from the sale or exchange of a capital asset held for not more than 6 months under section 23(k)(4) of the Internal Revenue Code of 1939. This, in turn, is dependent upon the factual determination of whether petitioner, in the year 1952, was engaged in a trade or business to which the debt was proximately related. Charles G. Berwind, 20 T.C. 808 (1953), affd., 211 F. 2d 575 (C.A. 3, 1954), and Pokress v. Commissioner, 234 F. 2d 146 (C.A. 5, 1956), affirming a Memorandum Opinion of this Court. Petitioner, in his petition, alleged that he devoted the majority of his time from 1944 throughout the period of the advances to the Wayside Food Shop, Inc., in "seeking out business opportunities, *244 promoting, organizing and financing them." On brief petitioner contends that he was engaged in the "business of buying, managing, developing, financing and selling corporations conducting liquor establishments", and that the advance by him of moneys to Wayside Food Shop, Inc., was proximately related to this business. In the taxable years 1944 to 1951, petitioner spent most of his time other than that spent in his work as a Certified Public Accountant in connection with the purchase and sale of stock of various corporations having licenses to sell liquor and in the operation of the businesses of those corporations. It is clear from the record that fees were credited on the books of the Wayside Food Shop, Inc., to petitioner in the years 1949, 1950, and 1951 but all of the amounts so credited had not been paid to petitioner at the end of each such year. There is no evidence as to whether fees were credited to petitioner by Wayside Food Shop, Inc., for the years 1947 and 1948 or what amounts, if any, were actually paid to petitioner in any of the years during which he was a stockholder and officer of the corporation. It appears that at some point Albert Miller who owned 50 percent *245 of the stock of Wayside Food Shop, Inc., was the manager of the business since the evidence shows that he resigned as manager in 1949. There is very little evidence of what services petitioner rendered to Wayside Food Shop, Inc., for the fees credited to him or what services he rendered to the other corporations, the stock of which he owned. Such evidence as there is fails to establish that petitioner was in the business of managing, developing, or financing such corporations. The evidence does not show sufficient activity by petitioner in lending money to these corporations to constitute a business of financing such corporations. Petitioner has shown that he made a few advances to corporations other than Wayside Food Shop, Inc., but these were isolated transactions. Even if petitioner had shown what services he rendered to the various corporations in managing and developing them, it would not follow that the corporate business was his business. It is well settled that the business of a corporation is distinct from that of its officers, stockholders, and directors. Estate of William P. Palmer, Jr., 17 T.C. 702 (1951). The evidence fails to establish that petitioner *246 was in the business of buying and selling liquor establishments or liquor licenses through the purchase and sale of stock of corporations having such licenses. The evidence is clear that in all his transactions involving the sale of such stock, petitioner reported the gain or loss as a capital gain or loss. While petitioner's reporting of the gain or loss on the disposition of the stock of the various corporations as capital gain or loss is not conclusive evidence that he was not engaged in the business of buying and selling such stock, it is indicative of how petitioner viewed his activities at the time they were being conducted. Petitioner is a Certified Public Accountant. He testified that he understood generally the distinction between capital gain and ordinary income. Had petitioner, in the years 1944 through 1949 or 1950 when all the sales of stock were made, considered himself to have been engaged in the business of purchasing and selling corporations conducting liquor establishments through the purchase and sale of the stock thereof, it would have followed that such corporations or their stock constituted the stock in trade of his business and thus not a capital asset. The *247 very fact that petitioner, during the period of time when all of the purchases and sales were made, reported such transactions as the sale or exchange of capital assets, creates a strong inference that petitioner was not engaged during those years in the business of buying and selling such establishments or the stock thereof. Cf. Thomas Reed Vreeland, 31 T.C. 78, 83 (1958) and H. Beale Rollins, 32 T.C. 604, 616, affd., 276 F. 2d 368 (C.A. 4, 1960). Even had petitioner been engaged in the trade or business of buying and selling corporations conducting liquor establishments or the stock thereof during the years 1944 through 1950, it is clear from the evidence that in the year 1952 when the debt of Wayside Food Shop, Inc., became worthless, he was not engaged in such business. The testimony is that all of petitioner's purchases and sales were in the years 1944 through 1949 with the possible exception of one sale in 1950. In 1951 petitioner had become interested in the plastics business and for the year 1952 his major income was from that business and other substantial portions were from his public accounting business and the management of the *248 Puerto Rican corporation. Under section 23(k)(4) of the Internal Revenue Code of 1939, in order for an indebtedness to be excluded from the definition of nonbusiness bad debt, the proximate relationship between the indebtedness and the taxpayer's trade or business must exist in the year in which the loss is sustained, here, the year 1952. Jan J. Boissevain, 17 T.C. 325 (1951). Cf. Aubrey S. Nash, 31 T.C. 569 (1958). The cases relied upon by petitioner are all factually distinguishable from the instant case. In Henry E. Sage, 15 T.C. 299 (1950), the petitioner had shown that from the time of his graduation from college in 1923 throughout the year 1941, he had participated in many separate activities and was constantly looking for opportunities for the use of his money and talent. He had invested his money, time, and energy in so many different enterprises that this activity amounted to a regular business carried on by him. Here, petitioner's activities throughout his working years which have been set forth in some detail in our findings fail to establish any consistent business on his part throughout the years other than that of Certified Public *249 Accountant. The facts in the instant case are, likewise, distinguishable from those in Giblin v. Commissioner, 227 F. 2d 692 (C.A. 1955), reversing a Memorandum Opinion of this Court, relied on by petitioner, as well as the other cases upon which he relies. Decision will be entered for the respondent.