W. A. Krueger Co. v. Commissioner.
W. A. Krueger Co. v. Commissioner
Docket No. 5285-65.
United States Tax Court
T.C. Memo 1967-192; 1967 Tax Ct. Memo LEXIS 69; 26 T.C.M. (CCH) 946; T.C.M. (RIA) 67192; October 5, 1967
Bernard S. Kubale, 1500 First Wisconsin National Bank Bldg., Milwaukee, Wis., for the petitioner. Robert M. Burns, for the respondent. DAWSON
Memorandum Findings of Fact and Opinion DAWSON, Judge: Respondent determined a deficiency of $13,710.69 in petitioner's income tax for its fiscal year ended June 30, 1961. The notice of deficiency disallowed deductions for a bad debt and for "legal and professional expenses." Only the bad debt deduction is in issue and turns on whether the cancellation by a parent corporation of accounts receivable from its wholly owned subsidiary in exchange for *70 newly issued shares of nonvoting common stock in the subsidiary gives rise to a bad debt deduction to the extent the amount of the indebtedness exceeds the value of the shares. Findings of Fact Some of the facts have been stipulated bytthe parties. The stipulation of facts and attached exhibits thereto are incorporated herein by this reference. W. A. Krueger Co. (herein called petitioner) is a Wisconsin corporation which had its principal office in Brookfield, Wisconsin, at the time the petition was filed in this proceeding. Its Federal corporation income tax return for the fiscal year ended June 30, 1961, was filed on an accrual basis with the district director of internal revenue, Milwaukee, Wisconsin. On August 14, 1958, the petitioner purchased for $11,000 all the common stock (701 shares) of Northwest Reporter, Inc. (herein called Northwest) from Jerome F. Borkoski (herein called Borkoski), president of the company. Northwest published a weekly paper which provided production for petitioner's experimental wet press. Shortly after acquiring the stock, petitioner discovered that Northwest had a deficit net worth of $3,722 rather than a net worth of $9,000 as alleged by Borkoski. *71 In settlement, Borkoski gave petitioner a $12,722 note which was accounted for in petitioner's books as a $10,999 note receivable and a $1 investment in Northwest. An inactive officer of petitioner with advertising and newspaper experience was made general manager of Northwest while Borkoski remained its president. The name Northwest Reporter, Inc., was changed to Midwest Publishing Corporation (herein referred to as Midwest) in January 1959. Out of a total of $8,461.25 of printing services performed by petitioner on open account for Northwest there remained an unpaid balance of $14.36 on August 14, 1958, the date of the stock transfer. By April 25, 1959, that balance had increased to $35,876.77 as a result of printing charges of $30,862.41 and cash advances of $5,000 to Midwest. Between August 14, 1958, and April 25, 1959, Midwest made five cash payments on its account to petitioner totaling $7,820.59 and, in addition, received a $626.30 credit on the sale of a truck to petitioner. During this period Midwest incurred operating losses and had a deficit net worth. On April 25, 1959, petitioner executed an agreement with Borkoski readjusting stock ownership in Midwest and reducing *72 amounts owed to petitioner by Midwest and Borkoski. All the outstanding stock of Midwest was converted into 701 shares of class A voting common stock and was transferred to Borkoski who agreed to pay $2,000 to petitioner in settlement of all notes and debts due from him. In addition, the open account and note due from Midwest was cancelled and exchanged for $4,000 in notes and 701 shares of Class B nonvoting common stock to be issued by Midwest to petitioner with a redemption agreement. Petitioner, using the reserve method in accounting for bad debts, made the following entries in its books on April 30, 1959, to reflect the April 25, 1959, agreement: 4-30-59 Reserve for bad
debts
$10,676.77
Notes Receivable-Midwest
Publishing
4,000.00
Investment-Midwest Pub-
lishing
21,200.00
Notes receivable-Midwest Pub-
lishing
$ 5,000.00
Accts. Rec.
30,876.77
To record reduction of amounts due from
Midwest Publishing and reflect change of
balance in receivables, per agreement dated
April 25, 1959 for debt and equity securities
in the subject corporation.
4-30-59 Reserve for bad
debts
$10,999.00
Notes Receivable-Noncurrent
$10,999.00
To record write-offs of bad debts - carrying
value of note receivable from J. Borkoski
in accordance with selling agreement dated
April 25, 1959.
*73 The balance sheet of petitioner as of June 30, 1959, included sundry assets in the amount of $25,200, composed of Notes Receivable-Midwest Publishing $4,000 and Investment-Midwest Publishing $21,200. The $10,676.77 addition to its reserve for bad debts as a result of the April 25, 1959, agreement was deducted as a bad debt by petitioner in its 1959 Federal income tax return. The following entry was made in the general journal of Midwest on April 30, 1959: April 30 Long-Term Debts
$ 5,000.00
Accounts Payable-Trade
30,876.77
Notes Payable
$ 4,000.00
Common Stock-Class B
21,200.00
Miscellaneous Income
10,676.77
To record reduction of amounts due to the
W. A. Krueger Co. and reflect exchange of
balance in payables, per agreement dated
April 25, 1959, for note and common stock
of Midwest Publishing Corp.
The class B stock of Midwest was treated as an investment asset by petitioner in its 1959 annual report and in its books from April 1959 through June 1961 at a recorded value of $21,200, even though petitioner's officers knew the stock was virtually worthless, in an attempt to defer the impact of the accumulated losses to a year with higher *74 earnings. The consolidated balance sheet of petitioner and Midwest as of June 30, 1959, containing the sundry assets account was examined by a certified public accounting firm and was certified as being in conformity with generally accepted accounting principles. The sundry assets account represented at that time approximately one-half percent of petitioner's total assets and 20 percent of its 1959 income. A claim for refund was filed by petitioner on April 26, 1961, with regard to its fiscal year ended June 30, 1959, for the allowance of an additional bad debt deduction of $20,200. The claimed addition to the bad debt reserve was based on the more realistic valuation of the Midwest stock of $1,000. The claim was disallowed by respondent. Activity in the petitioner's "reserve for bad debts" account during the fiscal year ended June 30, 1961, was as follows: Balance June 30, 1960
$19,975.53
Additions
65,042.37
Total
$85,017.90
Charges: Philip F. Emburg
222.45
Family Campout Maga-
zine
43,838.07
Investment-Midwest Pub-
lishing
20,200.00
Other Write-offs
757.38
Total
65,017.90
Balance June 30, 1961
$20,000.00
Petitioner received several *75 unsatisfactory offers for the class B stock of Midwest after 1959 and sold it in February 1962 for $1,000. The bad debt deduction claimed in 1961 for the $20,200 addition to petitioner's reserve for bad debts was not predicated on a change of opinion as to the true value of the Midwest stock, but rather on a determination that 1961, a high earnings year, would be the optimum time to absorb the "loss." Respondent disallowed the deduction on the grounds that petitioner had failed to show that a bona fide debt existed in 1959 and that 1961 was an inappropriate year to claim the deduction if, in fact, it was valid. Petitioner was allowed a capital loss on the sale of the Midwest stock in its fiscal year ended June 30, 1962. Opinion Arguing alternatively, petitioner makes a three-pronged attack on respondent's determination: (1) The advances constituted a bona fide debt which qualified for deduction under the bad debt provisions of section 166, Internal Revenue Code of 1954, and the regulations promulgated thereunder; (2) the petitioner was entitled in 1959 to charge its reserve for bad debts with the difference between the total "debt" of Midwest and the value *76 of the class B stock of Midwest; (3) the petitioner properly charged its bad debt reserve in 1961 in order to correct the "erroneous recordation of the 1959 transaction," and is therefore entitled to make an addition of $20,200 to its reserve for bad debts in the year 1961. Respondent counters with the following alternative arguments in support of his position: (1) The advances to Midwest were capital contributions when made because petitioner knew its wholly owned subsidiary was insolvent and expected repayment only out of future earnings and profits, if any; (2) irrespective of the nature of the advances when made, they became capital investment when cancelled in exchange for newly issued common stock of Midwest; (3) petitioner's fiscal year ended June 30, 1961, was an improper year for claiming the deduction because no portion of the alleged partial worthlessness occurred during that year. We agree with respondent's second contention. Consequently, it is unnecessary for us to discuss the first and third alternative contentions of the parties. Section 166(c) of the 1954 Code allows a deduction for a reasonable addition to a reserve for bad debts. A gift or contribution to capital *77 is not considered a debt for purposes of section 166. Section 1.166-1(c), Income Tax Regs. If the advances by petitioner were contributions to Midwest's capital when made, clearly there was no occasion for a bad debt deduction. However, if we assume, without deciding, that the advances were loans when initially made, we find that the "indebtedness" was converted into a capital investment when cancelled in exchange for common stock. The present case is within the letter and intendment of the rule announced in Lidgerwood Mfg. Co. v. Commissioner, 229 F. 2d 241, 243 (C.A. 2, 1956), affirming 22 T.C. 1152 (1954), certiorari denied 351 U.S. 951 (1956), where the Court of Appeals said: Where a parent corporation voluntarily cancels a debt owed by its subsidiary in order to improve the latter's financial position so that it may continue in business, we entertain no doubt that the cancellation should be held a capital contribution and preclude the parent from claiming it as a bad debt deduction. That the petitioner intended it to be a capital contribution is clear, for it not only received stock in exchange for the cancellations *78 but made entries in its books to reflect the transaction as such. Bratton v. Commissioner, 6 Cir., 217 F. 2d 486 is an authority in point. We agree with it. Giblin v. Commissioner, 5 Cir., 227 F. 2d 692, may be distinguishable on the facts; in so far as the opinion expresses views opposed to our own we respectfully disagree with them. The Lidgerwood rationale was developed from the well established rule that the cancellation of a debt owed by a corporate debtor to a stockholder of the debtor constitutes a capital contribution rather than taxable income to the debtor. See Commissioner v. Auto Strop Safety Razor Co., 74 F. 2d 226 (C.A. 2, 1934); section 108, Internal Revenue Code of 1954. It follows a priori that if the debtor receives a contribution to its capital, the creditor makes such contribution. It is argued by petitioner that Lidgerwood is distinguishable on the fact that both before and after the cancellation in exchange for stock, the parent corporation owned 100 percent of the stock of the subsidiaries. The point was raised in Lidgerwood, however, only to emphasize that the parent corporation need not receive *79 any greater equity in its subsidiary as a result of the cancellation in order to trigger capital treatment. In both Lidgerwood and the present case the creditor corporation decided to forego its right to repayment in order to strengthen the subsidiary, thereby increasing the possibility of dividends from future prosperity. Petitioner cites I.T. 3548, 1942-1 C.B. 74, which states that the difference between the value of property, including securities, received in satisfaction of a debt and the amount of the debt may be deducted as a bad debt. The ruling was not intended, however, to control the present situation where the original advances had at least some attributes of contributions to capital and where the creditor voluntarily characterized the transfer as an investment. Petitioner also places misdirected reliance on the case of Giblin v. Commissioner, 227 F. 2d 692 (C.A. 5, 1955), reversing a Memorandum Opinion of this Court. Unlike this case, the Giblin case involved an individual taxpayer who was said to be "engaged in the business of dealing in enterprises." Significantly, the taxpayer in that case received a partial payment of $20,000 rather than *80 stock in cancellation of the corporate indebtedness to him. The instant case is clearly distinguishable. Petitioner knew Midwest was insolvent both when the open account was cancelled and when the advances were originally made. Petitioner could reasonably expect payment only out of Midwest's possible future earnings and profits - an arrangement which is explained in part by the fact that Midwest's operations provided production for petitioner's experimental wet press. Under similar circumstances advances to a subsidiary to buoy its weak financial condition were held to be capital contributions. American-LaFrance-Foamite Corporation v. Commissioner, 284 F. 2d 723 (C.A. 2, 1960), affirming a Memorandum Opinion of this Court. The gratuitous cancellation of a large item of indebtedness in Midwest's books which substantially improved its financial position was of the same character. The form used by petitioner to characterize the 1959 agreement cannot be ignored when harmonious with the substance of the transaction. Petitioner received common stock of Midwest as a result of the cancellation of the open account and recorded a capital investment of $21,200. Midwest increased *81 its capital account in the same amount. Petitioner contends that only the actual value of the stock received by petitioner constituted its equity investment in Midwest. We disagree. By its cancellation, the total indebtedness became a contribution to Midwest's capital because its net worth was increased in that amount. Generally, any loss suffered on such an investment would occur only when the investment is closed out. Accordingly, we hold for respondent on the controverted issue. Decision will be entered under Rule 50.