Ralph and Helen Biernbaum v. Commissioner.
Biernbaum v. Commissioner
Docket Nos. 84651, 93135.
United States Tax Court
T.C. Memo 1963-210; 1963 Tax Ct. Memo LEXIS 135; 22 T.C.M. (CCH) 1046; T.C.M. (RIA) 63210; August 6, 1963
Sidney B. Palley, 133-11 231 St., Laurelton, N. Y., and Warren J. Kaps, for the petitioners. Gerald J. Robinson, for the respondent. BRUCE Memorandum Findings of Fact and Opinion BRUCE, Judge: The respondent determined deficiencies in income tax for the calendar years 1956 and 1957 in the respective amounts of $6,079.70 and $34,075.53. The sole issue as to each year is the amount of the net operating loss deduction, if any, available to the petitioners. The deduction claimed involves losses incurred in the years 1952 through 1955. Some facts are stipulated. Findings of Fact The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. The petitioners, husband and wife, reside in Stamford, Connecticut. Prior to 1956 they resided in Rochester, New York. They filed *136 joint returns for the years 1952 through 1957 with the director of internal revenue at Buffalo, New York. For convenience, Ralph Biernbaum will be referred to herein as the petitioner. Ralph was the son-in-law of Jacob Gross, who was the principal stockholder of Jacob Gross, Inc., a corporation organized in 1936. The principal business of this corporation was the management of real properties in Rochester. The petitioner was employed by this corporation prior to 1947. Jacob Gross died in 1947, and shortly thereafter petitioner acquired all the stock and became president. This corporation, for convenience, is sometimes hereinafter referred to as JG. During the period 1949 through 1955 petitioner participated in the promotion and development of shopping centers under the following names at the places listed: Name
Place
Mt. Hope Shopping Center
Rochester, N. Y.
Endwell Shopping Center
Endicott, N. Y.
North Park Shopping Cen-
ter
Rochester, N. Y.
Ridge-Clinton Shopping Cen-
ter
Rochester, N. Y.
Bull's Head Shopping Center
Rochester, N. Y.
North Flint Plaza Shopping
Center
Flint, Mich.
Shelbyville Road Shopping
Center
Louisville, Ky.
Shively Plaza Shopping Cen-
ter
Louisville, Ky.
Yellowstone Shopping Center
Amarillo, Tex.
Wyoming Township Shop-
Grand Rapids,
ping Center
Mich.
Middlesex County Shopping
New Brunswick,
Center
N.J.
Columbia Park Shopping
North Bergen,
Center
N.J.
North Goodman Plaza Shop-
ping Center
Rochester, N. Y.
Antietam Valley Shopping
Center
Reading, Penn.
*137 Petitioner was generally an officer or shareholder in each of the shopping centers with which he was associated. The petitioner and his brother Harvey formed a partnership in 1951 to operate a general merchandise store under the name Birns Department Stores. The petitioner was desirous of having a going business to serve as a first tenant in some of the shopping centers he was promoting in order to induce other prospective tenants to take leases. This business was incorporated in 1953. The business was operated at a loss in 1952 and in 1953. The petitioner advanced money to the corporation and paid rent for it. He did not expect repayment if that business failed. His capital investment was $2,500. The corporation ceased operations in 1954. The petitioner sustained a loss in 1954 when his advances to this corporation became worthless. The first shopping center undertaken by the petitioner was known as Mt. Hope Shopping Center, at Rochester. In 1949 a representative of a center market chain known as Loblaw's came to Joseph Grassi and asked him to find a location in that area. Grassi, in turn, approached the petitioner. Suitable land was found by the petitioner and Grassi, and the *138 petitioner arranged to borrow funds from James F. Sheehan, of Rochester, to acquire it. To secure title the promoters acquired the stock of a corporation which owned the land. A new corporation was formed to operate the center, which was completed in 1950. The petitioner was not reimbursed for his expenses and drew no salary from the corporation. He received stock. He was an officer and a director of that corporation. In 1950 he disposed of his stock interest. The business address of the Mt. Hope corporation was 23-25 Exchange Street, which was also the address of petitioner and of JG. The center was built and is still operating. The second shopping center promoted by the petitioner was known as Endwell Plaza, at Endicott, New York. The land was located by the petitioner and Joseph Grassi. Funds were provided by Guy Thomas Grassi, Fred Geib, Francis D'Amanda, and Anthony P. Niger. In March 1950 title was taken for convenience in the name of Delevan Realty Corporation, in which corporation petitioner had an interest. The petitioner negotiated leases with tenants, retained an architect to draw plans, arranged for bids, and let the contract. A permanent loan was made by the Home Life *139 Insurance Company. In July 1950, before construction began, a new corporation, Endwell Plaza, Inc., was formed in which the investors and Joseph Grassi and the petitioner became stockholders. The petitioner was an officer and director but received no salary from that corporation. Title to the shopping center was transferred to it. The petitioner supervised construction. The North Park Shopping Center at Rochester was built in response to a request by Hyman Mandell to build on property which he owned and offered for such use. It was necessary for the petitioner to acquire adjoining land to make a tract of sufficient size. The petitioner agreed in writing with Mandell to form a corporation to own and control the center, with Mandell to have 60 percent and petitioner 40 percent of the stock, both parties to be directors and without salary. The Home Life Insurance Company authorized a loan of $265,000 secured by a first mortgage on the premises, and the principals were required to furnish collateral bond. The petitioner secured the tenants and supervised construction. In April 1955 the petitioner transferred to JG all right, title, and interest to notes and loans payable to him from *140 North Park, and JG, in turn, transferred them to two individuals who loaned money to the petitioner. The loan was made to JG to avoid usury laws and for that reason was guaranteed by that corporation. Petitioner pledged his North Park stock as collateral. The petitioner later forfeited his stock to Mandell. Ridge-Clinton, at Rochester, was a shopping center planned by the petitioner. He located the property and took an option on the land. He bought it with borrowed funds. The lender was A. S. Merz, of Rochester. The petitioner solicited tenants and secured leases. A corporation, Ridge-Clinton, Inc., was formed in which the petitioner owned all the stock. The petitioner arranged permanent financing with Union Central Life Insurance Company, of Cincinnati. The general contractor failed, and the petitioner completed the construction with the subcontractors, with the result that the cost exceeded estimates. The petitioner arranged to sell the property to pay the subcontractors and clear the liens. In January 1953 Ridge-Clinton, Inc., transferred the property to Robert Bersani and Isadore Raymond, of Syracuse, and also transferred to them all leases then in effect. The petitioner agreed *141 to save harmless the purchasers from all claims arising against the transferor and guaranteed full performance of the sales contract. The petitioner incurred a net loss on his stock. His investment was $8,269.60, and his stock became worthless in 1953. Another shopping center in Rochester was known as Bull's Head Plaza. The petitioner located suitable land and acquired it in the name of Troblo Realty, Inc. Later, during construction, Bull's Head Plaza, Inc., was formed to take over the operation. The stockholders in this corporation were Joseph Grassi, Thomas Grassi, Anthony Niger, Fred Geib, and Francis J. D'Amanda. The petitioner was an officer, but received no salary and bore his own expenses incurred in the promotion. He was to have received stock but did not actually receive it because the conditions under which he was to be entitled to it were not fulfilled. A mortgage commitment was secured and construction proceeded, but the contractor failed. Some of the stockholders then withdrew and the petitioner borrowed money from other lenders in an effort to complete the project. He borrowed from still others to repay the first loans. In January 1954 he secured a bank loan of $150,000 *142 on collateral furnished by friends and relatives. The note was given in the name of JG to avoid usury laws, and the petitioner and others endorsed it individually. A payment of $73,003.25 was made in August 1955 by a relative and a payment of $48,290.54 by the petitioner in October 1955 with borrowed funds. The petitioner borrowed this amount from 23-25 Exchange Corporation, which was a corporation owned by Fred Geib. The petitioner deposited these funds in the account of JG and then had JG pay the bank to apply on the note. In 1956 23-25 Exchange Corporation credited JG with management commissions in the amount of $26,000 and credited the petitioner with the amount of $22,922.32 as salary for services as an officer. Out of these amounts the petitioner repaid in 1956 the amount he had borrowed in 1955 from 23-25 Exchange Corporation. The petitioner did not report the receipt of this salary on his return for 1956. The petitioner forfeited his stock in the Bull's Head Plaza shopping center to Geib when he failed to pay the balance of the bank loan. The petitioner took part in the construction of a shopping center in Flint, Michigan, in 1952. In August 1952 he signed an agreement *143 with David Rosenthal and Irving S. Norry, stating, in part, as follows: RECITALS Delevan Realty Corporation (hereinafter called Delevan) has heretofore obtained an option to purchase premises in the City of Flint, Michigan, briefly known as Lots 92-103, both inclusive, as well as Lot 87 in the subdivision known as Sharp Manor, all for the total sum of $200,000.00. Biernbaum has heretofore loaned to Delevan the sum of $28,500.00 and Second Parties have heretofore loaned Delevan the sum of $20,000.00, both of which sums have been applied by Delevan in part payment of the purchase price stated in the option. It is the intention of the parties to develop the property above described into a Shopping Center and to cause a corporation to be created to take title thereto and manage and operate the same. AGREEMENTS (1) The parties will cause to be created and organized a Corporation (hereinafter referred to as the Flint Corporation) to take title to the property above described, the stock of which will be owned Fifty (50%) Percent by Biernbaum and Fifty (50%) Percent by Second Parties equally, or the nominees of the respective parties. The Purposes of the Flint Corporation will *144 be to construct the necessary buildings and facilities for a Shopping Center, to negotiate leases, borrow such moneys as are necessary and take such other steps as may be necessary to that end. (2) The number of directors of the Flint Corporation shall be three and each of the parties, or their nominees, shall be directors for the first year. The officers of the Flint Corporation for the first year shall be Ralph Biernbaum, President and David J. Rosenthal, Vice-President-Secretary and Treasurer. The By-Laws shall contain a provision that all certificates of stock and checks or orders for the payment of money shall be signed by both the President and Treasurer. (3) Concurrently herewith Biernbaum will cause Delevan to assign to Second Parties the option held by Delevan, given by Aubra E. Sharp and Wife, acknowledged June 10, 1952 for the purchase of Lots 92-103, above stated, and Second Parties agree to make such timely further payments on account of the purchase price stated therein as will permit the acquisition of title to the premises of the Flint Corporation; and upon the organization of the Flint Corporation Second Parties agree to advance the further sum of $15,000.00 as *145 a loan to said Corporation for the purpose of acquiring Lot #87 in the subdivision known as Sharp Manor. The acquisition by Second Parties of such option and/or property is for the benefit of the Flint Corporation and Second Parties agree to transfer the same to the Flint Corporation upon its organization. The petitioner later purchased another lot in his own name and transferred it to the new corporation called North Flint Plaza, Inc. The petitioner also agreed that his stock should be deposited with Norry and Rosenthal as security for the indebtedness of the corporation to them. The petitioner secured leases and arranged for a mortgage with the Massachusetts Mutual Life Insurance Company. After the foundations and walls were built the project ran into difficulties and the petitioner forfeited his stock to his associates. The petitioner took part in building a shopping center in 1954 and 1955 at Louisville, Kentucky, called Shelbyville Plaza. The land was under lease and petitioner acquired the lease, solicited tenants, and secured a mortgage commitment. A corporation was formed in which Raymond Lecesse and William Cucci were stockholders. Petitioner supervised construction and *146 arranged for additional financing. He drew no salary from the corporation and paid all the expenses of the promotion. He was to receive stock. His stock was pledged for a loan, and when he was unable to pay this the stock was forfeited. The petitioner proposed to build a shopping center at Shively, Kentucky, in 1954, called Shively Plaza. He selected a site and borrowed money from investors for acquisition and promotion. He secured $75,000 from one group of Rochester investors for a 50 percent interest and gave them in August 1954 a written agreement to repurchase their interest if they chose to withdraw. A corporation was formed and petitioner was an officer thereof. He did not receive stock. He paid the expenses of the promotion. After foundations were laid, the petitioner found that he could not complete the shopping center and he abandoned the project. In July 1956 the investors notified him of their election to withdraw and demanded reimbursement. The investors dealt with the petitioner on a personal basis and had no connection with JG. The petitioner took steps toward building a shopping center at Amarillo, Texas, to be known as Yellowstone Shopping Center. In March 1955 *147 he secured, for $15,000, a 6-months option on a suitable tract to buy for approximately $300,000. He secured the agreement of Julius Epstein, of Chicago, and Elmer J. Babin, of Cleveland, to contribute the funds for purchase of the land. He agreed with three other men to transfer to each of them 5 percent of the stock of a corporation to be formed for this purpose in consideration of payment of $4,500 to him by each of them. He was not successful in securing tenants and therefore dropped the option. No corporation was organized in this instance. The petitioner also proposed to build a shopping center at Grand Rapids, Michigan, to be called Wyoming Township Shopping Center. He located a site, and William Cucci and Raymond Lecesse provided funds to purchase the land A corporation was formed. The investors decided to abandon the project. The petitioner received no stock. He incurred expenses for which he was not reimbursed. The center was not built. The petitioner planned in 1953 to develop a shopping center at New Brunswick, New Jersey, to be identified as Middlesex County Shopping Center. He secured options to lease certain tracts of suitable land, subject to the securing of zoning *148 to permit the desired use. In April 1954 he entered into an agreement with Donald S. Leipham, of Rochester, to form a corporation for the purpose of owning and developing the shopping center, the stock to be owned equally by each. Leipham was to contribute $25,000, the petitioner was to obtain tenants and leases, obtain mortgages, supervise construction and development, pay all his personal expenses, and manage the property without cost to Leipham or the corporation. Leipham retained the option to withdraw, and petitioner agreed to return to him on demand any moneys advanced. In November 1954 Leipham advanced another $13,000 for payment of land rent. In March 1955 Leipham advanced $18,000 more for a fee with respect to a mortgage application. The corporation was formed prior to construction. The petitioner was an officer. He did not receive stock because the center was not completed. The mortgage he obtained was not sufficient to build the center, and no further investment could be obtained. The petitioner planned in 1952 to construct a shopping center at Columbia Park, North Bergen, New Jersey. He secured agreements with Earl S. Relin and James L. Randall to advance funds in return *149 for shares in the projected corporation. He was unable to have the property zoned for use as a shopping center. A corporation was formed and the petitioner was an officer. The land had been surveyed but no construction was started. Some leases had been secured and a mortgage commitment was made. No stock was issued, and the project was dropped. The zoning issue was in the courts for over two years and was finally decided against the promoters. The petitioner paid Relin $5,000 in 1957 pursuant to his agreement to reimburse Relin for half of his investment if the project failed. The petitioner was approached by representatives of Morgan School of Driving, Inc., which owned certain land at Rochester, to build a shopping center. He entered into an agreement to do this through a corporation named Goodman Central Shopping Plaza, Inc., in which he was to own 40 percent of the stock, as voting stock, and the school was to own 40 percent, as voting stock and 20 percent as nonvoting stock. The school furnished the land, and the petitioner solicited tenants and agreed to bear his expenses of promotion. He secured tenants and a mortgage commitment, the construction contract was arranged, and *150 the corporation was organized. The petitioner was unable to secure a sufficient construction loan, and the contractor foreclosed on the property. As a result, the petitioner lost his right to receive his share of the stock. The petitioner built a shopping center near Reading, Pennsylvania. Property was offered by an owner there. An option on land was secured and the petitioner solicited tenants. A corporation was formed under the name of Antietam Valley Realty Corporation. The petitioner received stock and was president of the corporation. In 1956 he agreed with certain investors to pledge his stock for a loan. Leases he secured were transferred to the corporation. The petitioner later attempted to sell his stock but was unable to find a purchaser. The petitioner also incurred some expense in connection with a proposed shopping center at Tuscaloosa, Alabama. The site was offered by a broker, the petitioner paid $1,000 for an option in July 1954 to purchase the property for $199,000, subject to zoning for use as a shopping center. The petitioner did not exercise the option. The income tax returns of JG for the years 1952 through 1955 state the business as "Real Estate" and show *151 the principal income as commissions and fees, principal expenses as salaries and general business expense, principal assets as cash and accounts receivable, and principal liabilities as bonds, notes, and mortgages payable. The returns report a loss for each year, and the balance sheets show an increasing deficit. The address of the corporation was 25 Exchange Street, Rochester. The offices at 23-25 Exchange Street were occupied by the petitioner, a law firm of Gossin and Atlas, and JG. The office expenses were shared by these parties. The petitioner's name was among those on the door of these offices. He sometimes used JG stationery for his personal correspondence and sometimes used the JG checking account for personal money transactions, charging or crediting his personal account on the books accordingly. Petitioner, from 1952 through 1955, filed his Federal income tax returns on the basis of his being a full-time employee of Jacob Gross, Inc., and did not report any separate business income or loss in Schedule C. In his returns for the years 1952 through 1955 the petitioner claimed hotel and travel expenses, legal expenses, commissions, and interest on loans as deductions *152 from adjusted gross income, and not as business deductions. He also reported as capital losses worthless shopping center securities. In his 1956 Federal income tax return petitioner inserted a schedule claiming a net operating loss carryforward to 1956 of $34,475.45. The amount of the claimed net operating loss carryforward was subsequently increased to $98,337.79 in accordance with a computation submitted as Exhibit "C" of the petition filed by the petitioner. The petitioners' income tax returns for the years 1952 through 1955 showed the following: 1952
1953
1954
1955
Salary: JG
$ 3,570.00
$ 4,420.00
$ 4,420.00
$ 3,230.00
Food Fair Properties
9,499.99
Net rental income
521.87
674.86
87.35
727.92
Gain on sale of land
60,000.00
Birns Dept. Store loss (partner)
13,716.27
Travel expenses
800.00
2,720.98
4,353.81
Interest paid
4,809.99
10,474.53
19,695.67
Other business expenses
5,408.00
Losses - stock worthless: Ridge-Clinton
8,269.60
Birns Dept. Store (corp)
81,565.64
Bull's Head
48,290.54
Income Tax
None
None
None
None
The petitioners' returns for 1956 and 1957 showed the following: *153 1956
1957
Commissions
$25,000.00
Salary: Food Fair Properties
$25,749.96
35,000.00
Peterwanda, Inc.
4,200.00
Long-term capital gain
10,000.00
Net rental: Income
383.00
Loss
161.94
Interest expense
15,709.80
13,804.55
Other business expenses
6,325.00
Operating loss carryover
34,475.45
61,544.05
Income Tax
None
None
In the years 1952 through 1955 the petitioner was in the business of promoting and developing shopping centers. In this business he incurred ordinary and necessary business expenses for travel and hotels, commissions, legal services, accounting services, interest on loans, fees and other expenses. He paid the following amounts during those years for interest, travel expense, and hotel expense in his business: Year
Interest
Travel
Hotel
1952
$ 2,250.00
$1,049.48
$ 641.25
1953
20,626.25
1954
8,726.49
2,283.41
1,022.82
1955
11,796.83
2,334.70
2,109.19 Also, he paid legal expense of $2,008 and commissions of $4,400 in 1954 in connection with his business. He was not reimbursed for these expenses. The petitioner's investment in the Ridge-Clinton shopping center was $8,269.60. *154 This became worthless in 1953. In 1954 the petitioner sustained a loss when his investment and loans to Birns Department Stores became worthless. His capital investment was $2,500. He also loaned $45,203.49 to the company, and in 1954 he paid $11,500 in rent on its account. In 1955 the petitioner sustained a loss when his investment in Bull's Head Plaza became worthless. The amount of his investment was $48,290.54. In the latter part of 1955 the petitioner entered into a contract of employment with Food Fair Properties, Inc., to serve in a managerial capacity at a substantial salary and with an option to acquire stock. During the taxable years 1956 and 1957 the petitioner paid certain business expenses related to his promotions of shopping centers in the earlier years. In 1956 he paid interest of $15,803, legal expense of $1,919.52, commissions of $2,360, expenses of an investigation for lost documents $1,363.24, and an amount due a subcontractor $1,500. In 1957 he paid interest of $20,246.48, legal expense $5,355, accounting fees $800, survey fee $500, and paid $5,000 to one of his investors, Earl Relin, pursuant to his guaranty. In 1956 the petitioner had salary income *155 of $22,922.32 from 23-25 Exchange Corporation which was not included in his return. Opinion In the years 1952 through 1955, which preceded the taxable years, the petitioner incurred losses and had no taxable income. In preparing his returns, neither he nor his accountant considered the possibility that he might be entitled to a net loss carryover. In 1955 he became employed by Food Fair Properties, Inc., at a substantial salary and with an option to acquire stock. It then became important to him to claim the benefit of a net loss carryover if he was, under the circumstances, entitled to it. In his return for 1955 the petitioner claimed a loss of $48,290.54 from his investment in Bull's Head Plaza, which became worthless, and claimed a carryover from prior years of $16,323.54, based on unused capital losses of $8,269.60 for 1953 and $8,053.94 for 1954. The computation made by petitioner in connection with the petitions filed shows a net operating loss for 1952 in the amount of $10,424.13, the larger part of which is due to a claimed loss from Birns Department Stores of $13,716. For 1953 a further net operating loss of $7,466.54 is shown, principally due to a claimed loss of *156 $8,269.60 from Ridge-Clinton, Inc. For 1954 a further net operating loss of $21,565.01 is shown, the principal item being a Birns Department Stores loss claimed of $68,053.94. The income for that year includes an item of $60,000 from Louisville, Kentucky. For 1955 an additional net operating loss of $58,882.11 is shown, the principal items including a loss on Bull's Head Plaza of $48,290.54, interest expense of $19,695.67, and travel expense of $4,353.81. The accumulated net operating loss deduction carried over to 1956 amounted to $98,337.79. The amount remaining as carried over to 1957 was $60,792.31. The petitioner contends that he was in the business of promoting and developing shopping centers in the years 1949 through 1955; that in doing this he sustained losses on account of legal expenses, commissions paid, interest on loans, and travel expenses, and on loans made to Birns Department Stores; that these were losses or bad debts incurred in his business and that he may therefore claim a net loss carryover to the taxable years 1956 and 1957. (Section 172, Internal Revenue Code of 1954.) The respondent contends that the petitioner's activities in promoting *157 the several shopping centers were undertaken on behalf of the various corporations organized or to be organized to develop and manage those centers, or, in the alternative, as the agent of his wholly-owned corporation, Jacob Gross, Inc. The respondent says also that the amounts of the losses claimed are not substantiated. The respondent emphasized that every shopping center involved was built with a view to its operation by a corporation and contends that any activities of the petitioner prior to the organizing of the particular corporation were carried out on behalf of the intended corporation since the land and the leases were all eventually transferred to the corporation and the mortgage was its obligation. The respondent says that the petitioner was at all times serving in the corporation's business and the result of his efforts was intended to inure solely to the benefit of the corporation; therefore, the expenses incurred were directly related to the corporation's business and are not deductible expenses of the petitioner's business. The method of developing a shopping center as carried out by the petitioner involved the following steps. He selected a suitable site and obtained *158 options on the land or made other arrangements to acquire it by purchase or lease. He sought investors to provide funds for acquisition and construction, or borrowed such funds. In some cases he prepared a brochure to describe the project to possible investors or tenants. He solicited tenants and secured leases or agreements as to occupancy. He obtained building permits, arranged for zoning, and negotiated a construction mortgage loan and long-term financing. Usually before construction commenced, a corporation was organized to build and operate the center. The investors received stock in the corporation. He was usually an officer in the corporation in order to act for it and sometimes was also a director. He received no salary from it. His agreement with the investors was that he would pay all his expenses of the promotion and was not to be reimbursed. If the project was not completed or did not succeed, he would have no way to recover these expenses. If it became successful, his usual arrangement was that he would receive some stock which might be retained and produce income or be sold for cash and provide a profit to him on the project. Usually he was to have 40 to 50 percent of *159 the stock. There were variations in these arrangements. In the Ridge-Clinton center he became the sole stockholder of the corporation. In the centers at Amarillo and Tuscaloosa the projects were abandoned without organization of any corporation. In the Shively and New Brunswick centers some investors withdrew, and he was obligated to repay their investments. In some ventures the contractor failed and the petitioner attempted to finish the construction by borrowing additional money, which resulted in losses to him and left him in debt. The petitioner cites Vincent C. Campbell, 11 T.C. 510 (1948), and Henry E. Sage, 15 T.C. 299 (1950), as supporting the proposition that a promoter of corporations may be in a trade or business as such. In Campbell, the taxpayers organized, owned, and operated 12 corporations engaged in the retail coal business to which they advanced money on open account. The loans to one of the companies became worthless in 1944. We held such loans to be business bad debts rather than nonbusiness bad debts, concluding that the individuals were in the business of organizing and operating these corporations. In Sage, the taxpayer had for many *160 years sought out ventures or activities in which to invest his money and services for profit. Some were profitable, others resulted in losses. We held that his investments of money and time were so frequent and regular as to amount to a business carried on by him. In A. J. Whipple v. Commissioner, 373 U.S. 193 (May 1963), the Court stated: Devoting one's time and energies to the affairs of a corporation is not of itself, and without more, a trade or business of the person so engaged. Though such activities may produce income, profit or gain in the form of dividends or enhancement in the value of an investment, this return is distinctive to the process of investing and is generated by the successful operation of the corporation's business as distinguished from the trade or business of the taxpayer himself. When the only return is that of an investor, the taxpayer has not satisfied his burden of demonstrating that he is engaged in a trade or business since investing is not a trade or business and the return to the taxpayer, though substantially the product of his services, legally arises not from his own trade or business but from that of a corporation. Even if the taxpayer *161 demonstrates an independent trade or business of his own, care must be taken to distinguish bad debts losses arising from his own business and those actually arising from activities peculiar to an investor concerned with, and participating in, the conduct of the corporate business. If the full-time service to one corporation does not alone amount to a trade or business, which it does not, it is difficult to understand how the same service to many corporations would suffice. To be sure, the presence of more than one corporation might lend support to a finding that the taxpayer was engaged in a regular course of promoting corporations for a fee or commission, see Ballantine, Corporations (rev. ed. 1946), 102, or for a profit on their sale, see Giblin v. Commissioner, 227 F. 2d 692 (C.A. 5th Cir.), but in such cases there is compensation other than the normal investor's return, income received directly for his own services rather than indirectly through the corporate enterprise, and the principles of Burnet, Dalton, du Pont and Higgins are therefore not offended. On the other hand, since the Tax Court found, and the petitioner does not dispute, that there was no intention *162 here of developing the corporations as going businesses for sale to customers in the ordinary course, the case before us inexorably rests upon the claim that one who actively engages in serving his own corporations for the purpose of creating future income through those enterprises is in a trade or business. That argument is untenable in light of Burnet, Dalton, du Pont and Higgins, and we reject it. n10 Absent substantial additional evidence, n11 furnishing management and other services to corporations for a reward no different than that flowing to an investor in those corporations is not a trade or business under § 23(k)(4). * * * [Footnotes omitted.] In Giblin v. Commissioner, 227 F. 2d 692 (C.A. 5, 1955), reversing a Memorandum Opinion of this Court, the Court of Appeals considered the activities of an attorney who engaged in a series of business ventures, some of them organized in corporate form. The Court there concluded (p. 698): Clearly, on the undisputed facts, Giblin was such a person as was described in the cases we have cited above. On eleven or twelve occasions between 1926 and 1945 he had contributed his time, talent, energy and money to the exploitation *163 of an idea to make money apart from his practice of law. He obviously lent such aid to these various enterprises as he considered, in the exercise of his business judgment, would best accomplish that purpose. To hold that a loss suffered from the becoming worthless of a loan made to one of these enterprises was not suffered in the course of his engaging in a trade or business, would be to apply a sterile and rigid approach that is not contemplated by the statute. In Ballentine on Corporations 102 (rev. ed. 1946), referred to by the Supreme Court in Whipple, the function of a promoter is described as follows: The primary function of the promoter is to find an enterprise and interest investors in financing a proposed corporation to take it over. He is the projector who originates the enterprise of which a corporation is the usual machinery. He is the pre-incorporation developer and manager of the business which the proposed corporation will undertake. The typical promoter,--the promoter in the fullest sense, performs various services in launching an enterprise and may employ experts, lawyers, bankers, solicitors and other persons to aid him. The various activities of the promoter *164 may be classified as follows: (1) the discovery and investigation of a promising business opportunity; (2) the formulation of business and financial plans; (3) assembling the enterprise by negotiations and obtaining some control over the subject matter by options or contracts made on behalf of the proposed corporation or on his own credit; (4) the making of arrangements for financing the enterprise and the flotation of securities; (5) last but not least, he must arrange tactful and painless methods for getting his own reward for the task of promotion out of the prospective investors and for reimbursement for his expenses, contracts, and services without frightening away those who are expected to provide the funds. He is thus practically in the position of a seller of the enterprise to the prospective investors, seeking a speculative profit for himself and his associates on the investment of others, very often taken in the form of securities. * * * The opinion of the Supreme Court in Whipple recognizes that an individual may be engaged in a regular course of promoting corporations for a fee or commission, or for a profit on their sale. This is what the petitioner contends was his *165 trade or business, and the frequency and continuity of his efforts in this field tend to support his contentions. The ventures were more frequent than in Giblin (cited with approval) and were within a narrow and specialized field rather than being random attempts to turn a profit. His services for some of the later centers were sought because of his experience in this field, and his employment with Food Fair Properties, Inc., was a result of it. At the time the petitioner selected a site, took an option, secured prospective tenants, negotiated a loan commitment, prepared building plans, and approached potential investors, there was usually no corporation involved. It was not until all the preliminary arrangements were made and the investors advanced funds that the shopping center corporation was organized with the investors as stockholders. The petitioner then acted to transfer the option or the land to it, assign the leases, and have it execute the mortgage. He supervised construction. If the venture appeared to be successful, he would then receive some stock, usually 40 or 50 percent. This is "compensation other than the normal investor's return," and is "received directly for *166 his own services rather than indirectly through the corporate enterprise." He was not engaged in "serving his own corporations for the purpose of creating future income through those enterprises," or "for a reward no different than that flowing to an investor" in them. He was not in control of the corporation involved, except in one case - Ridge-Clinton. In our opinion the petitioner was in the business of promoting shopping centers, and his losses and bad debts were incurred in that business. The fact that the petitioner was the only stockholder in Ridge-Clinton does not, in our opinion, require a different conclusion as to that shopping center. The evidence shows a generally consistent pattern of a very specialized business, and this single deviation from that pattern is not enough to alter the effect. We are not called upon to decide whether the facts would support the petitioner's argument had Ridge-Clinton been the only shopping center he promoted. The respondent contends that if there was any promoter of these shopping centers other than the individual corporations organized to operate them it was the petitioner's wholly-owned corporation, JG. The respondent says that since *167 the JG returns stated that the petitioner, its president, devoted full time to that corporation's business, he could not have been acting for himself in his promotional work. Also, the petitioner said that sometimes he represented himself as acting for JG and sometimes took leases in the name of that corporation; that he used the offices of JG, its stationery, secretary, and telephone in his promotions; and that many of the loans or advances made to him by investors went through the books of JG and through its bank account. We find these arguments unconvincing. The petitioner used JG's bank account for much of his personal business, but charged or credited personal items to his open personal account. The office expenses were shared by the attorneys, JG, and the petitioner, according to agreement, and charged to the proper parties. The petitioner sometimes took leases in his own name or in the name of a corporation for convenience and sometimes used JG to hold the contract until the shopping center corporation could be organized. He used JG stationery when he had none of his own or perhaps to create a favorable impression on the addressee, but this did not mean that he was invariably *168 acting for it. Sometimes he had JG give the note covering a loan, in order to avoid the usury laws, but, as JG was insolvent, the lender was relying on his personal liability and that of his guarantors. The investors in the shopping centers were dealing with him personally and not as the representative of JG or any of the shopping center corporations. The Supreme Court, in a footnote in the Whipple case, supra, expresses disapproval of certain lower court cases, including Sage and Campbell, supra, to the extent they hold or contain statements to the effect that one who actively engages in serving his own corporations for the purpose of creating future income through such enterprises is in a trade or business. Although Sage and Campbell are cited by the petitioner herein, we find the present case is distinctly different in that the petitioner was not serving his own corporations but was promoting projects with a view to a present reward flowing directly from his personal efforts. In another footnote, the Supreme Court, in Whipple, compares J. T. Dorminey, 26 T.C. 940 (1956). In that case a taxpayer was allowed a bad debt loss as incidental to and proximately related *169 to his produce business, which loss resulted from investing in and advancing loans to a shipping corporation intended to ensure that he was supplied with bananas. In the present case the petitioner's investment in and loans to Birns Department Stores had a similar purpose. He used this business, first a partnership, later a corporation, as a first tenant in a projected shopping center so that when he approached other prospective tenants he could, by showing that some space was already under contract, induce them to contract for space. If losses resulted from his investment in Birns, the benefit of facilitating sales of space might make the net effect profitable to the petitioner in the end. At least, that was his purpose, although the result did not meet his expectations. These losses, also, were incurred in his business. The petitioner has shown the amounts paid as interest on loans, legal expenses, commissions and fees and as hotel and travel expenses in relation to his promoting activities. There is no showing of travel or hotel expense for 1953, but he is making no claim on that account. The items paid prior to 1956 would enter into the computation of the loss carryover to *170 that year. Those paid in 1956 or 1957 are business expenses of the taxable year when paid. The loss on account of the investment in Birns Department Stores is not proved in the amount claimed. On brief the petitioner claims a loss of $63,126.43. The books of that business show a loan due him of $7,903.49 and other indebtedness of $37,300. He also paid rent for this corporation and introduced cancelled checks to substantiate this. We assume that such rent paid prior to incorporation was included in the indebtedness. The rent paid following incorporation and prior to 1956 amounted to $11,500. His stock investment was $2,500. The loss prior to 1956 as thus substantiated is $59,203.49. The petitioner claimed a loss in his return for 1953, but on brief says this loss was in 1954. The corporation was doing business in 1954, and petitioner paid rent for it in that year. We find that this loss occurred in 1954. The checks covering rent for Birns include one for $2,500 paid in 1957, apparently an item representing a debt of the corporation which the petitioner paid some three years after it ceased to do business. This item is not allowable as a business expense of 1957. Welch v. Helvering, 290 U.S. 111 (1933). *171 The petitioner testified that he paid $48,290.54 to the bank in 1955 to apply on the note for $150,000 given by JG and guaranteed by himself and others and that this was the amount of his loss when his investment in Bull's Head Plaza became worthless in 1955. The note, which is in evidence, shows that such a payment was made in October 1955. The petitioner borrowed this amount from 23-25 Exchange Corporation which was controlled by Fred Geib, one of the investors in the Plaza. The evidence shows that in 1956 the petitioner was credited by this corporation with $22,922.32 as salary, which he used in part to repay the loan. Although the petitioner testified that he reported this amount as income, no such item appears on any of his tax returns. We find that the petitioner was in the business of promoting shopping centers, that he incurred losses in his business, and that he is entitled to a net operating loss carryover from the years 1952 through 1955, inclusive, to 1956. A recomputation of the losses and the carryover will be necessary in any event. The computation will also include as income for 1956 the salary item omitted from the petitioner's return. The carryover to 1957 will *172 also be affected by the revised computation. Decisions will be entered under Rule 50.