EARL M. SMITH AND RUTH A. SMITH, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 9354–72. Filed May 30, 1974.

*H. Vernon Davids*, for the petitioners.
*Robert P. Edler*, for the respondent.

FEATHERSTON, *Judge:* Respondent determined a deficiency of $8,886.37 in petitioners' Federal income tax for 1967. The issue for decision is whether petitioners are entitled to a business bad debt deduction, as permitted by section 166(a),[1] for a loss incurred on loans to their wholly owned corporation, or whether they are limited by section 166(d) to a nonbusiness bad debt deduction for their loss.

### FINDINGS OF FACT

At the time the petition was filed herein, petitioners Earl M. Smith and Ruth A. Smith were legal residents of Longwood, Fla. Although a joint Federal income tax return was filed for the year at issue and both spouses petitioned this Court, the activities of petitioner Earl M. Smith alone govern the disposition of this case. Accordingly, the term "petitioner" will refer to him individually.

Starting in about 1963, petitioner was employed by Southern Fiber Glass Products, Inc. (Southern), which manufactured recreational boats. In late 1965 or early 1966, Southern was sold to Ashland Oil Co. (Ashland) and, at that time, petitioner became president of Ashland's new subsidiary. He held this position until he resigned in November 1968. He received a salary of $30,000 per year, plus a bonus and

---

[1] All section references are to the Internal Revenue Code of 1954, as in effect during the tax year in issue, unless otherwise noted.

a stock option which he exercised after leaving Ashland. Throughout this period, petitioner was responsible for the marketing of recreational boats.

Petitioner's only stock interest in Southern was 100 shares received as a gift from Harold Slama, the original owner of Southern. Petitioner sold these shares to Ashland in 1969, reporting a long-term capital gain of $141,056.28 on his 1969 tax return.

On their return for 1970, petitioners claimed a loss on section 1244 stock in the amount of $48,909.92. Based on that claimed loss, petitioners were later allowed a tentative net operating loss carryback adjustment for 1967. The subsequent disallowance of the claimed deduction resulted in a deficiency for 1967 which is the subject of the present controversy.

The section 1244 stock loss was claimed for the stock of Sweetheart Flowers, Inc. (Sweetheart), a Florida corporation organized on or about July 17, 1969. Ten thousand shares of common stock with a par value of $1 per share were authorized.

Sweetheart's stock transfer ledger shows the issuance, on July 28, 1969, of 1,000 shares of common stock as follows:

| Name of stockholder | Number of shares |
| --- | --- |
| Theodore H. Van Deventer, Jr. | 998 |
| Mary M. Yawn | 1 |
| Nancy L. Johnson | 1 |

Van Deventer was Sweetheart's attorney and the other two shareholders were employees of an accountant who occupied an office adjoining that of the attorney. On the same date, these original shareholders transferred all their rights as incorporators and subscribers of Sweetheart's stock to petitioner who thereupon became Sweetheart's sole shareholder. The stock register does not show that any additional shares of Sweetheart stock were issued after July 28, 1969.

The only formal meeting of Sweetheart's directors disclosed by the record was held on July 28, 1969. At this meeting, petitioner was elected a director and president of Sweetheart. He never received a salary from Sweetheart, but planned to pay himself a salary if the corporation were successful.

The minutes of this meeting recite the requirements for qualifying the corporate stock under section 1244 and contain a "Plan to Issue 1244 Stock." However, the plan fails to state the maximum amount to be received by the corporation for the stock to be issued under the plan, and the record indicates that the board never discussed such amount. Moreover, no issue price was stated for the stock, and this also was not discussed by the board.

Petitioner advanced money to, and made payments on behalf of, Sweetheart beginning on February 14, 1969, and continuing to Decem-

ber 31, 1970. These amounts were characterized on Sweetheart's books as loans payable to petitioner. Such advances varied both in amount and timing. Petitioner made loans totaling $21,250 prior to Sweetheart's incorporation. By the end of its first taxable year on December 31, 1969, petitioner's advances to Sweetheart totaled $34,042.50.[2] On December 31, 1970, Sweetheart's books reflected a net indebtedness to petitioner of $46,865.81.

In 1969, petitioner also formed Triple S Distributing Co., Inc. (Triple S), which was to be operated in conjunction with Sweetheart. On his 1969 tax return, petitioner listed the disposition of his shares in Triple S under the long-term capital gains and losses portion of Schedule D. On his 1970 return, petitioner reported as a nonbusiness bad debt the amount which he had "paid under transferee liability as sole shareholder of Triple S."

In May 1970, petitioner became sales manager for Gandel Products, Inc. (Gandel), which manufactured signs. Two months later, in July 1970, he purchased 2,000 shares of Gandel stock, representing 10 percent of the total shares outstanding. Petitioner received no salary from Gandel, but was paid a commission on the signs that he sold. Although he was a director of Gandel, petitioner had no control over its operations. He was hired because Gandel, which had been in existence only 6 or 7 months, lacked the sales background to market its signs properly. Gandel's owners found petitioner to be an excellent salesman, whose efforts favorably affected the company's sales. Gandel was eventually liquidated, and the record does not show what disposition petitioner made of his stock in that corporation.

In 1970, petitioner invested in Mid-State Fiberglas Products, Inc., whose name was changed to Trophy Cars, Inc. (Trophy). This company manufactured dune buggies. Petitioner owned 2,067 shares of Tropy stock and was employed to supervise Trophy's business activities and to take charge of marketing. He received no salary and only a partial reimbursement of his expenses. Although sales increased after he started work, Trophy eventually failed because its potential customers had difficulty obtaining bank financing or insurance. On his 1970 return, petitioner took a short-term capital loss deduction for his Trophy stock.

In late 1971, petitioner was employed by Allied Boat Co. (Allied) at a salary of $300 a week. Allied was in financial straits, and petitioner thought he could improve its situation. Petitioner was not successful in his efforts on behalf of Allied, and he was orally engaged

---

[2] This amount reflects a $10,000 debit entry made on that date, representing a payment for "corporation stock." The stock register discloses that only 1,000 shares of $1 par value stock were issued, and the record does not show that the additional 9,000 shares of authorized stock were issued.

to help sell the company. Allied was eventually sold to the Crews Craft Co. of Perry, Fla. As compensation for the sale, petitioner was to receive a commission of 10 percent of any individual items sold and 5 percent of the remainder of the corporation's assets as payments were received; at the time of trial, he had received approximately $900 to $1,000 under this agreement.

While working at Allied, petitioner began an ambulance manufacturing program. After a personality clash with Allied's owner, petitioner purchased this portion of the business at cost and put it into a corporation called Star-Line Enterprises, Inc. (Star-Line), which was organized in January 1973. As president and majority shareholder of Star-Line, petitioner is paid a salary of $52,000 per year. Star-Line is currently developing its own deferred compensation, pension, or profit-sharing plans.

On his return for 1970, petitioner deducted, with respect to Sweetheart, a loss on section 1244 stock in the amount of $48,909.92. This amount was calculated by adding back to the balance of "Loans Payable to Earl M. Smith" ($46,865.81) as reflected on Sweetheart's books as of December 31, 1970, the amount ($10,000) "paid" for corporate stock, represented by a debit entry to that same account made December 31, 1969, and subtracting the "amount recovered in dissolution" ($7,955.89).

In the statutory notice, dated October 4, 1972,[3] respondent determined a deficiency of $8,886.37 for 1967 which resulted from his determination that the loss ($48,909.92) claimed for 1970 was not allowable under section 1244, but was deductible only as a nonbusiness bad debt, subject to the limitations of section 1211. This resulted in the disallowance of the net operating loss carryback adjustment to 1967 and the determination of the deficiency in that year.

### ULTIMATE FINDING OF FACT

During 1970, petitioner was not in the trade or business of organizing, promoting, or selling corporations for gain.

### OPINION

Petitioner claims a deduction against ordinary income for the net amount of $48,909.92 which he lost in his dealings with Sweetheart. His position is that he "was in the business, or was attempting to get into the business of developing corporations as going concerns for sale to customers." Respondent maintains that petitioner's activities did

---

[3] The parties agree that, under the provisions of sec. 6501(h), the statute of limitations for 1967 had not run at the time the statutory notice was mailed.

not constitute a trade or business of promoting corporations for profitable sale and that his loss is deductible only as a nonbusiness bad debt [4] under section 166(d). We are compelled to agree with respondent.

Although subsection (a) of section 166 [5] provides a deduction for the full amount of any debt which becomes worthless during the taxable year, section 166(d) renders that provision inapplicable to nonbusiness bad debts. Section 166(d)(2) defines a nonbusiness debt to mean a debt other than (a) "a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer" or (b) "a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business." Losses attributable to nonbusiness debts are accorded the same treatment as losses on the sale or exchange of a capital asset held for not more than 6 months. Sec. 166(d)(1)(B).

Under section 166, the character of a bad debt is determined by the relationship it bears to the taxpayer's trade or business. Only if the debt bears approximate relationship to the taxpayer's trade or business will it qualify for business bad debt treatment under section 166(a). Sec. 1.166-5(b), Income Tax Regs.; *Putnam* v. *Commissioner*, 352 U.S. 82, 90-92 (1956). Otherwise, it is classified as a nonbusiness bad debt. Whether a bad debt has a "proximate" relation to the taxpayer's trade or business is determined by the "dominant motivation" of the taxpayer in creating the debt. *United States* v. *Generes*, 405 U.S. 93, 103 (1972), rehearing denied 405 U.S. 1033 (1972).

In *Whipple* v. *Commissioner*, 373 U.S. 193 (1963), rehearing denied 374 U.S. 858 (1963), the Supreme Court considered the issue here

---

[4] In the notice of deficiency and on brief, respondent treated the entire loss as a nonbusiness bad debt deductible as a short-term capital loss even though $10,000 of the loss consists of the amount paid for Sweetheart's stock. He does not contend that this $10,000 portion of the loss is allowable only under sec. 165(g) which, in this case, would characterize the item as a long-term capital loss. Cf. sec. 1211(b)(1)(C)(ii). We shall consider the issue accordingly.

[5] Sec. 166, dealing with the deductibility of bad debts, contains the following:
SEC. 166. BAD DEBTS.
  (a) GENERAL RULE.—
    (1) WHOLLY WORTHLESS DEBTS.—There shall be allowed as a deduction any debt which becomes worthless within the taxable year.

    *        *        *        *        *        *        *

  (d) NONBUSINESS DEBTS.—
    (1) GENERAL RULE.—In the case of a taxpayer other than a corporation—
      (A) subsections (a) and (c) shall not apply to any nonbusiness debt; and
      (B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months.
    (2) NONBUSINESS DEBT DEFINED.—For purposes of paragraph (1), the term "nonbusiness debt" means a debt other than—
      (A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or
      (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business.

presented—the classification to be assigned to a worthless debt owing a taxpayer by a corporation in which he owns stock. In that case, the Court held that the loss on loans to a corporation by its organizer and controlling shareholder was a nonbusiness bad debt. The rationale was that a corporation has a personality separate from its shareholders and that its business is not necessarily their business. *United States* v. *Generes, supra* at 102. The Court reasoned that neither investment activities nor promotional activities providing only an investor's return to the shareholder-creditor constitute a trade or business which would render the debt a business bad debt deductible as an ordinary loss.

However, in *Whipple*, the Court recognized that an individual may engage in the independent trade or business of organizing and promoting corporations for profitable sale or of promoting and selling corporations for a fee or commission.[6] See 373 U.S. at 202–203. In such circumstances, the expected profit, fee, or commission is received directly for the taxpayer's own services rather than through the corporate enterprise, and "he may properly be said to have a business of his own separate and apart from the businesses of the corporations." *Townshend* v. *United States*, 181 Ct. Cl. 635, 641, 384 F. 2d 1008, 1012 (1967). Whether petitioner is engaged in the trade or business of promoting corporations for profitable sale is a question of fact. *Giblin* v. *Commissioner*, 227 F. 2d 692, 697 (C.A. 5, 1955).

We do not think the facts support a finding that petitioner was engaged in a separate and independent business of promoting and selling corporations. "Devoting one's time and energies to the affairs of a corporation is not of itself, and without more, a trade or business of the person so engaged. * * * When the only return is that of an investor, the taxpayer has not satisfied his burden of demonstrating that he is engaged in a trade or business." *Whipple* v. *Commissioner*, 373 U.S. at 202. Petitioner has not shown that he sought income different in character from that flowing to a normal investor.

Our Findings show that petitioner acquired stock in several corporations—Southern, Triple S, Gandel, Trophy, and Star-Line, as well as Sweetheart. His income tax returns show that he reported his extraordinary profit on the sale of his Southern stock as long-term

---

[6] The evidence does not show that petitioner was in the business of selling corporations for a fee or commission. In addition to petitioner's sale of Crews Craft Co. in 1971 or 1972 for a fee, we have only his unsupported testimony that he sold another small fiberglass company located in Sanford, Fla., for an undisclosed commission. Even accepting both transactions, these sales do not support a finding that petitioner was "engaged in a *regular course* of promoting corporations for a fee or commission." (Emphasis added.) See *Whipple* v. *Commissioner*, 373 U.S. 193, 202 (1963), rehearing denied 374 U.S. 858 (1963). A close business associate testified at trial that he was not aware that petitioner ever received fees or charged fees for purely promotional activities. In any event, petitioner was not attempting to sell Sweetheart's stock for a fee or commission since he was its sole shareholder.

capital gain, whereas that gain would have been ordinary income if he had been a promoter of corporations at that time. He reported his loss on the insolvency of Trophy as a capital loss, and his loss from Triple S as a worthless nonbusiness bad debt. Even as to Sweetheart, petitioner claimed on his Federal income tax return for 1970 a deduction under section 1244 for his loss on his dealings with that corporation, and that section is applicable only where the loss "would (but for this section) be treated as a loss from the sale or exchange of a capital asset." Sec. 1244(a).[7] All of those facts strongly suggest that petitioner viewed himself as an investor and not as one in the trade or business of developing corporations for sale to customers.[8] *I. Hal Millsap, Jr.*, 46 T.C. 751, 757 (1966), affd. 387 F. 2d 420 (C.A. 8, 1968).

Nor does petitioner's prior or subsequent involvement with these various corporations indicate a regular course of developing corporations for sale. Petitioner's expertise is in the area of selling and marketing products, not corporations. At Southern he was a highly compensated vice president and marketing manager from 1963 until late 1965 or early 1966, when Southern was sold to Ashland. Thereafter, he remained as president of a subsidiary until November 1968. Thus, for the 5 years immediately prior to his becoming involved with Sweetheart, he was an employee, and there is no evidence to show that he was involved to any significant degree in negotiating the sale of Southern's stock.

Admittedly, petitioner invested some of the proceeds of his Southern stock in Sweetheart, Triple S, and Gandel; however, there is simply no tangible evidence of any effort to promote and sell these corporations to customers. Indeed, the evidence indicates that the time and effort he devoted to these companies was directed toward promoting their businesses as such. Similarly, as to Trophy, he managed the business and took charge of its sales. All these companies eventually failed, and there is no evidence of a realistic effort to sell them for profit. Petitioner testified that he attempted to merge Trophy with another Florida corporation; however, we note that Trophy failed in the same year as he acquired his stock in it.

Petitioner is presently employed as president of Star-Line at a substantial salary. That corporation's development of a deferred

[7] While petitioner alleged, in his petition, that he was entitled to an ordinary loss under sec. 1244, he did not discuss this issue on brief and has apparently abandoned that posture. In any case, he is not entitled to the benefits of sec. 1244 because the purported "plan" fails to meet the requirements of sec. 1.1244(c)–1(c)(1), Income Tax Regs. See also Rev. Rul. 66–67, 1966–1 C.B. 191.

[8] As noted in our Findings, although Gandel was liquidated, the record does not show what disposition petitioner made of his stock in that corporation or how he treated it on his income tax return.

compensation, profit-sharing, or pension plan, in which petitioner will presumably participate, hardly suggests that a sale is being planned.

While petitioner testified that the sale of Southern made him realize that the most profitable way to get ahead was to build a company and then sell it, this realization is not inconsistent with an investor's goals. Many investors buy stocks for the capital gains they hope to realize. An intent to profit from the sale of the stock of a company does not make one a dealer unless his activities are so extensive as to constitute a trade or business. And there is no showing that this was true here.[9]

In summary, as to Sweetheart, we do not think petitioner has shown that he sought a return different from that of an ordinary investor; nor were his activities distinguishable. He admitted that he intended for Sweetheart to pay him a salary as soon as the corporation was able to do so and that he had no timetable for its disposition. We have noted that, as of the date of the filing of his income tax return for 1970, indeed even as late as the date of the filing of the petition with this Court, petitioner claimed the benefit of section 1244—a claim wholly inconsistent with his position that his interest in Sweetheart was merely part of his stock in trade.

To reflect the foregoing,

*Decision will be entered under Rule 155.*

---

[9] Petitioner made no argument at trial or on brief that he was engaged in the trade or business of loaning money. While he claimed to have made a noninterest loan to Southern, not evidenced by a note, there was no corroborating proof. Also Star-Line made a loan to another ambulance company. However, it is axiomatic that the business of a corporation is not that of its shareholders or officers. *Burnet* v. *Clark,* 287 U.S. 410 (1932) ; *Dalton* v. *Bowers,* 287 U.S. 404 (1932). Finally, petitioner reported only one item of interest income on his returns for 1966 through 1970 other than that received from his bank savings accounts ; this sum represented interest from an individual. In any case, these activities are simply not extensive enough to support a finding that petitioner was in the trade or business of loaning money. See *Holtz* v. *Commissioner,* 256 F. 2d 865 (C.A. 9, 1958), affirming a Memorandum Opinion of this Court.