JAMES H. RAY AND ANGELINE L. RAY, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Ray v. Commissioner
Docket No. 17533-79.
United States Tax Court
T.C. Memo 1981-578; 1981 Tax Ct. Memo LEXIS 164; 42 T.C.M. (CCH) 1333; T.C.M. (RIA) 81578; October 1, 1981. Tommy D. Hughes, for the petitioners. Helen T. Repsis, for the respondent. DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION DAWSON, Judge: Respondent determined the following deficiencies in petitioners' Federal income taxes: Year
Deficiency
1975
$ 4,396.00
1977
8,170.50
Two adjustments made by respondent have been conceded *165 by the petitioners. The only issue presented for decision is whether petitioner James H. Ray is entitled to deduct as business bad debts certain loans and loan guarantees made by him to Interwest International, Inc., a corporation in which he was a stockholder, officer and director. FINDINGS OF FACT Some of the facts have been stipulated and are so found. James H. Ray and Angeline L. Ray (petitioners) were residents of Corrales, New Mexico, when they filled their petition in this case. Their joint Federal income tax returns for the years 1975, 1976 and 1977 were filed with the Internal Revenue Service Center at Austin, Texas. James H. Ray (hereinafter referred to individually as petitioner) has been in the investment banking business for about 20 years. He has earned his income during such time through his efforts in obtaining funds for private businesses and companies which are primarily attempting to go public or are in financial trouble because of bad management or adverse economic conditions. He was formerly manager of the Albuquerque office of Hanifen, Imhoff & Sanford, an investment banking firm. Petitioner would usually receive a fee for his services or take *166 stock in the company. He did corporate finance work for a gas company, a mineral development company, a nuclear medicines company, and one engaged in air pollution controls. The underwriter for sale of stock in some of these companies was Hyder and Company, an investment banking firm. Generally, in the various financial arrangements, the petitioner would be issued a substantial number of shares of insider's stock which would later be repurchased by the company when funds were available. Sometime prior to 1972 the petitioner was retained by Clean, Inc., a small company involved in air pollution controls and a new technological method for transmitting cross-country communications. Clean, Inc. had no money and it was in debt. Petitioner arranged private debt financing through a group of Albuquerque physicians. He also arranged for the acquisition by the company of a Timpte Trailer franchise, which was a profitable operation that would give it a cash flow, and a Small Business Administration loan. In addition, he obtained an underwriting commitment from Hyder and Company. After conferring with Mr. Hyder, the name of Clean, Inc. was changed to Interwest International, Inc. (hereinafter *167 Interwest). For these services the petitioner, in January 1972, acquired 75,000 shares of Interwest stock at a purchase price of one cent per share. On January 28, 1972, he became a director of Interwest, and in June 1972 he became Secretary-Treasurer of the company. Petitioner received compensation of $ 6,805 in cash in 1972 for his services as Secretary-Treasurer. In August 1972 the petitioner was issued an additional 24,000 shares of Interwest stock as compensation for services rendered. Such stock was reported on Schedule C of petitioners' Federal income tax return for 1972 at a value of one cent per share, which was also the par value of the shares. In November 1972 the petitioner received 100,000 shares of Interwest stock as consideration for the transfer to Interwest of his interest in certain real estate located in Mora County, New Mexico, in order to secure financing from Timpte, Inc.
Prior to May 4, 1973, the petitioner was granted an option by Interwest to purchase 62,500 shares of Interwest stock. The option, exercisable until November 1, 1975, was never exercised by him. In December 1972 Interwest issued to petitioner 24,300 shares of Interwest stock to *168 convert indebtedness of the corporation to petitioner into stock. On May 4, 1973, there was a public offering of Interwest stock. It was not successfully completed. At the time of the public offering of Interwest stock the petitioner owned 199,800 shares, or 22 percent, of the outstanding stock. Prior to May 4, 1973, Interwest received a loan guaranteed by the Small Business Administration. Petitioner guaranteed payment of such loan. He paid $ 6,878 to the S.B.A. in 1976 and $ 30,000 in 1977 as guarantor of the loan for Interwest. Petitioner made loans to Interwest for which the corporation executed the following promissory notes payable to him: Date
Amount
July 31, 1972
$ 20,380
August 15, 1973
40,000
August 16, 1973
40,000
On Schedule C of their Federal income tax return for 1975 the petitioners claimed a deduction for business expenses of $ 60,380. The deduction was specified as being a "pay-off of guaranteed corporate loans at Bankruptcy-Interwest Int., Inc." Schedule C also shows the petitioner's principal business activity as "Investments." On Schedule D of their Federal income tax return for 1975 the petitioners claimed a long-term capital *169 loss of $ 36,000 and identified the asset as "Interwest Int., Inc." On their Federal income tax returns the petitioners claimed deductions for business bad debts as follows: Year
Amount
1975
$ 60,380
1976
16,478
1977
30,000
These claimed deductions were disallowed by respondent and treated as nonbusiness bad debts subject to the capital loss provisions. ULTIMATE FINDING OF FACT Petitioner's dominant motive in making loans to, and guaranteeing loans for, Interwest was to protect his investment in the corporation. OPINION Petitioner contends (1) that he is entitled to claim the amounts of the loan and loan guarantees as business bad debts because he was engaged in the business of financing and promoting corporations and (2) that his dominant motive in making the loans to, and guaranteeing the loans of, Interwest was for business rather than investment purposes. To the contrary, respondent contends that the claimed losses should be allowed only as nonbusiness bad debts because they were not incurred in the petitioner's business and that his dominant motive in making and guaranteeing the loans was to protect his investment in Interwest. We agree *170 with the respondent. Section 166(a) [1] provides for a deduction by a taxpayer of any debt which becomes worthless during the taxable year. However, section 166(d) provides that in the case of a taxpayer other than a corporation the loss from a nonbusiness debt which becomes worthless in the taxable year shall be considered as a short-term capital loss deductible only to the extent provided for in section 1211. A nonbusiness bad debt is defined in the statute as a debt other than one created or acquired in connection with a trade or business of the taxpayer or the loss from the worthlessness of which is incurred in the taxpayer's trade or business. In Whipple v. Commissioner, 373 U.S. 193, 202 (1963), which is heavily relied on by the respondent, the Supreme Court stated that the business of a corporation is not the business of the stockholder-taxpayer and that-- care must be taken to distinguish bad debt losses arising from his own business and those actually arising from activities peculiar to an investor *171 concerned with, and participating in, the conduct of the corporate business. Thus, the character of a bad debt must be determined by the relationship it bears to the taxpayer's trade or business. Only if it bears a proximate relationship to the taxpayer's business will it qualify for bad debt treatment under section 166(a). Section 1.166-5(b), Income Tax Regs. In determining whether a bad debt has a proximate relationship to the taxpayer's trade or business, the proper measure is that of dominant motivation. United States v. Generes, 405 U.S. 93 (1972). Whether a taxpayer is engaged in the business of financing and promoting corporations or is a mere investor depends upon the facts of each case. Prior to the decision in Whipple v. Commissioner, supra, the Tax Court had held that where a person invests in several businesses and takes part in their management "over and above passively giving financial aid," he may be in the business of investing and personally participating in various ventures. Smith v. Commissioner, 17 T.C. 135, 146 (1951). However, this view was rejected by the Court of Appeals for the Second Circuit which *172 reversed this Court in 203 F.2d 310 (2d Cir. 1953). The conflict in prior cases was resolved by the Supreme Court in Whipple. It held that devoting one's time and energies to the affairs of a corporation is not by itself a trade or business of the person so engaged. The presence of more than one corporation might lend support to a finding that the taxpayer was engaged in a regular course of promoting corporations for a fee or commission or for a profit on their sale, but in such cases there is compensation other than the normal investor's return, income received directly for his own services rather than indirectly through the corporate enterprise. Whipple v. Commissioner, supra at 202-203. The Supreme Court carefully pointed out that, "absent substantial additional evidence," furnishing management and other services, such as financing and promotion, for a reward no different than that flowing to an investor in those corporations is not a trade or business. See Maloney v. Spencer, 172 F.2d 638 (9th Cir. 1949), and Dorminey v. Commissioner, 26 T.C. 940 (1956), cited by the Supreme Court as being cases where "substantial *173 additional evidence" was presented. What is necessary is strong proof that the taxpayer was engaged in a trade or business of financing and promoting corporations with the intent of "developing the corporations as going businesses for sale to customers in the ordinary course." Whipple v. Commissioner, supra at 203. See also Smith v. Commissioner, 62 T.C. 263, 268-269 (1974). Here we think the petitioner has failed to establish by "substantial additional evidence" that he was engaged in the business of financing and promoting corporations. We have only his self-serving testimony uncorroborated by documentary evidence of his activities with other corporations or the testimony of third party witnesses. Consequently, we have made no finding that the petitioner was engaged in such a business. [2] In our judgment his activities simply do not rise above those of an investor, and this record lacks the "substantial additional evidence" necessary to bring the present case within the ambit of Maloney and Dorminey. Moreover, while the petitioner might, in general, be considered a promoter, he may not be considered a promoter with respect to his *174 particular activities with Interwest which are peculiar to an investor. See Deely v. Commissioner, 73 T.C. 1081, 1092-1096 (1980). Loans and loan guarantees made by a taxpayer must be shown to be for the purpose of creating ordinary gain rather than capital gain. Here the only return the petitioner could have anticipated receiving from Interwest was from the appreciation of his stock, which was 22 percent of the outstanding shares. Although petitioner received some cash compensation in 1972, it was minimal and the payments lasted for only seven or eight months. He received no other cash or assets from Interwest other than shares of stock. We note that, if the public offering of Interwest stock had been successful, there would have been a decrease in the public investor's equity by virtue *175 of the stock held by the then current shareholders, including petitioner. Conversely, there would have been a substantial and direct increase in the value of the stock held by the then current shareholders, including petitioner, by virtue of the additional shares purchased by the public investors. Thus, we think the petitioner's dominant motivation in making and guaranteeing loans to Interwest was, as respondent argues, to "facilitate a vehicle which would make possible the appreciation of his stock." United States v. Generes, 405 U.S. 93 (1972). Petitioner's assertion that his dominant motive in making and guaranteeing the loans was to realize ordinary income as soon as possible is contrary to the Federal income tax return filed by him for 1975. Although the tax return shows a deduction of $ 60,380 as a business expense for Interwest loans, i.e., an ordinary loss, the petitioner claimed a capital loss of $ 36,000 on his Interwest stock. By claiming the latter amount on Schedule D the petitioner elected to treat it as a capital asset or investment. Hence a loss was recorded on the return, but a capital gain would have resulted if the stock had increased in value. *176 See Deely v. Commissioner, supra at 1095; Millsap v. Commissioner, 46 T.C. 751, 757 (1966), affd. 387 F.2d 420 (8th Cir. 1968). Accordingly, considering the evidence in this record, we conclude that the petitioner's dominant motive in making loans to Interwest and guaranteeing its loans was to protect his investment in the corporation. Therefore, the loans made by him and the payments he made pursuant to his guarantees were not losses from the worthlessness of business bad debts. Instead, such losses resulted from the worthlessness of nonbusiness bad debts. Decision will be entered for the respondent. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the years is issue, unless otherwise indicated.↩
2. Various cases cited by the petitioner, which stand in sharp contrast to the instant case, are Schlumberger Technology Corp. v. United States, 443 F.2d 1115 (5th Cir. 1971); Lundgren v. Commissioner, 376 F.2d 623 (9th Cir. 1967), reversing a Memorandum Opinion of this Court; and Milbank v. Commissioner, 51 T.C. 805↩ (1969).